Olivia JOHNSON, Appellant

v.

COMMONWEALTH of Kentucky, Appellee

2013–SC–000383–DG

Supreme Court of Kentucky.

RENDERED: DECEMBER 18, 2014

COUNSEL FOR APPELLANT: Daniel T. Goyette, James David Niehaus, Office of

the Louisville Metro Public Defender, Louisville

COUNSEL FOR APPELLEE: Jack Conway, Attorney General of Kentucky, David A. Sexton, Special Assistant Attorney General, Michael J. O'Connell Jefferson County Attorney

## OPINION OF THE COURT

Appellant, Olivia Johnson, is the owner of Franklin, a dog of mixed breeding and medium stature. On April 16, 2012, a bench trial was held in the Jefferson District Court to determine Johnson's liability for two incidents where Franklin attacked other dogs. The first incident occurred on August 2, 2011, when Franklin attacked a neighborhood dog while Franklin was being walked by Johnson's mother. The second incident occurred on November 20, 2011, when Franklin attacked a dog that lived with residents across the hall from Johnson's apartment while Franklin and the other dog were both in a common area hallway. This incident also involved Johnson's mother, who testified that she had just returned from walking Franklin when the attack occurred. She further testified that although she had a leash in her hand, Franklin was not secured. Johnson was not present for either attack.

The District Court found no liability for the August 2, 2011, incident. Regarding the incident that occurred on November 20, 2011, the court found Johnson guilty of a Class A misdemeanor for "failing to restrain a dangerous dog in violation of Chapter 91 of the Louisville Metro County Code of Ordinances." As a result, Johnson was ordered to pay $250 and serve a 90 day jail sentence which was conditionally discharged for two years. The trial court also provided Metro Animal Services with the discretion to euthanize Franklin, who was in their custody at that time. The Jefferson Circuit Court affirmed the judgment of the trial court. Johnson petitioned the Court of Appeals for discretionary review of her judgment and sentence which the court denied. Upon her subsequent petition to this Court, we granted discretionary review.

### *Preservation*

Johnson presents two arguments on appeal. First, she asserts that the Ordinances are unconstitutional and invalid. Next, she contends that she was physically incapable of performing the duty imposed on her by the Ordinances. Johnson concedes that although these arguments were raised before the Jefferson Circuit Court, they were not presented to the Jefferson District Court and, thus, not properly preserved for our review. *See Hayes v. Commonwealth,* 175 S.W.3d 574, 589 (Ky.2005). Johnson also failed to comply with CR 24.03 which requires that she provide the Attorney General with proper notice when challenging the constitutionality of a statute. *Benet v. Commonwealth,* 253 S.W.3d 528, 532 (Ky.2008). Therefore, we will not address the merits of these two arguments. Nevertheless, we reverse Johnson's conviction due to improper enforcement of the Ordinances.

### *The Ordinances*

Chapter 91 of the Louisville Metro Code of Ordinances ("the Ordinances"), attempts to regulate dangerous dogs and potentially dangerous dogs. Any person found in violation of §§ 91.150 and 91.152 is guilty of a Class A misdemeanor. § 91.999(A). It is unclear from the record under which specific provision Johnson was convicted. Pursuant to § 91.152(A) and (B), a dangerous dog or potentially dangerous dog determination must be made by the Director of Louisville Metro Animal Services and/or his or her designee (the "Director").

### *Failure to Properly Enforce the Ordinances*

█ The record before this Court does not indicate that Johnson's dog Franklin was ever formally classified as either "dangerous" or "potentially dangerous" by the Director. However, the trial court found that Franklin was a dangerous dog as a result of the incident that occurred on November 20, 2011. Yet, the dangerous dog classification is a condition precedent to a charge under § 91.152. Here, the trial court erroneously issued a post facto determination of that issue at trial. That ordinance requires that this classification be made by the Director prior to the offense proscribed in order for it to constitute an offense under § 91.152.

Furthermore, the record demonstrates that a field behavior test was administered on Franklin by an Animal Control Officer after the initial August 2, 2011, incident. Franklin received a perfect score and demonstrated extremely positive behavioral characteristics. The "general evaluation and comments" section of that report is blank. If there is any documentation classifying Franklin as a dangerous or potentially dangerous dog prior to the November 20, 2011, incident, it was not presented to this Court and, therefore, does not instruct our decision.

### *Conclusion*

For the foregoing reasons, we hereby reverse the decision of the Jefferson Circuit Court and remand with instructions to vacate the judgment of the Jefferson District Court.

All sitting. Minton, C.J., Abramson, Keller, Scott, JJ., concur. Cunningham, J., concurs by separate opinion in which Venters, J., joins. Noble, J., concurs by separate opinion.

### CUNNINGHAM, J., CONCURRING:

I agree with the per curium opinion regarding the improper enforcement issue. However, I believe that the other issues Johnson raises also require our attention.

### *Preservation*

The majority declines to review the merits of Johnson's arguments due to improper preservation. Although the arguments Johnson now raises were presented to the Circuit Court on appeal, they were not initially raised before the District Court. While the District Court is vested with the authority to hear matters of constitutional concern, the realities of litigation dictate that constitutional challenges are unlikely to be raised or adequately addressed in that forum. In this case, the informality of the proceedings was such that any constitutional concerns were likely to receive scant attention. The trial judge did not even wear a robe or a coat.

Furthermore, this Court should not overlook manifest injustice in any form, especially if such injustice would fall upon untold numbers of future defendants if the Ordinances at issue in the present case remain unabated. Neglecting a facially unconstitutional or invalid law because of a litigant's procedural error would render the interests of justice subservient to those of the judicial economy. Indeed, "[w]e alone are the final arbiters of our rules of practice and procedure." *Glenn v. Commonwealth*, 436 S.W.3d 186, 188 (Ky.2013) (quotation omitted). It is shocking to me that Johnson was convicted of an offense committed by her mother. It was uncontested that Johnson was not even present when the so called "offense" was committed. This absurd and unjust result demands that we review Johnson's arguments as presented.

### Constitutionality and Validity of the Ordinances

Johnson specifically contends that the General Assembly cannot delegate its authority to define crimes and assess criminal punishments to any other agency or subdivision of government. Several statutes and constitutional provisions are relevant to our determination and will be discussed in turn.

### Statutory Interpretation

In construing statutes, we must give effect to the intent of the General Assembly. *Maynes v. Commonwealth*, 361 S.W.3d 922, 924 (Ky.2012). "We derive that intent, if at all possible, from the language the General Assembly chose, either as defined by the General Assembly or as generally understood in the context of the matter under consideration." *Id.* (citing *Osborne v. Commonwealth*, 185 S.W.3d 645 (Ky.2006)). We construe all applicable statutes together in an attempt to harmonize and give effect to the provisions of each. *See Commonwealth ex rel. Conway v. Thompson*, 300 S.W.3d 152, 170 (Ky.2009); *Commonwealth v. Phon*, 17 S.W.3d 106, 108 (Ky.2000).

Critical to this analysis is KRS 500.020(1) and KRS 83A.065(2). The former provides that "[c]ommon law offenses are abolished and no act or omission shall constitute a criminal offense unless designated a crime or violation under this code or another statute of this state." KRS 500.020(1). That statute was enacted in 1974 and became effective on January 1, 1975.

The Ordinances at issue in the present case are clearly not designated as crimes or violations under Chapter 500 of the Kentucky Penal Code. Therefore, under a plain reading of KRS 500.020(1), Louisville Metro lacks the authority to enact the Ordinances, "unless designated a crime or violation under ... *another statute* of this state." *Id.* (Emphasis added).

The Commonwealth argues that KRS 83A.065(2) satisfies that later requirement.

KRS 83A.065(2) provides in pertinent part that "[a] city may make the violation of any of its ordinances a misdemeanor or a violation by the express terms of the ordinance." This statute became effective in 1992 and applies to all cities, no matter their classification.[1] Furthermore, the most recent statute establishing Louisville Metro's powers, privileges, and jurisdiction is KRS 67C.101. That statute became effective in 2000 and omits any express mention of the authority to enact misdemeanor crimes. Rather, it provides that Louisville Metro may "[p]ass and enforce by fines and penalties, if necessary, all ordinances, not inconsistent with law...." KRS 67C.101(3)(i). Therefore, the task of construing *all* relevant statutes together in an attempt to find harmony is a delicate undertaking in this instance.

Most importantly, KRS 500.020(1), enacted in 1975, and KRS 83A.065(2), effective 17 years later, present polices that directly conflict. The latter allows cities to enact criminal offenses while the former vests that authority solely with the General Assembly. However, well-established rules of statutory construction, our state and federal constitutions, and strong public policy concerns instruct that legislative intent evidenced by KRS 500.020(1) must prevail.

1. KRS 83A.065(2) specifically applies to Louisville Metro through KRS 67C.101(2)(d), which provides that consolidated local government "is a separate classification of government which possess the greater powers conferred upon, and is subject to the lesser restrictions applicable to, county government and cities of the first class under the Constitution and general laws of the Commonwealth of Kentucky."

It is clear that by enacting KRS 500.020(1), the General Assembly did not intend to share its exclusive authority to enact and define crimes and criminal penalties. The express requirement that criminal offenses be designated by "another statute of this state[,]" is not satisfied by enacting a subsequent statute authorizing local governments to adopt their own criminal ordinances punishable by incarceration. For an act or omission to constitute a criminal offense punishable by incarceration, such behavior must be specifically designated as a crime by statute. *See Gibson v. Commonwealth,* 291 S.W.3d 686 (Ky.2009) ("The power to define crimes and establish the range of penalties for each crime resides in the legislative branch.").

For example, in *Taylor v. Commonwealth,* we held that a Kentucky insurance statute prohibiting insurance agents from misappropriating premiums was a criminal offense that was distinguishable from a similar provision in the penal code. 799 S.W.2d 818, 819–20 (Ky.1990). In so holding, we recognized that KRS 500.020(1) provided the foundation for that penal insurance statute because it constitutes a crime under *"another statute of this state." Id.* at 819 (citing KRS 500.020(1) (emphasis added)); *see also* KRS 258.235(5)(a) and KRS 258.990(3)(b) (animal control statutes providing criminal liability). Thus, KRS 500.020(1) does not sanction the abdication of authority embodied by KRS 83A.065(2).

### Legislative History

As previously noted, KRS 500.020(1) became effective in 1975, thereby codifying and re-structuring all crimes that existed under prior statutes or at common law. In doing so, the General Assembly adopted much of the Model Penal Code. This resulted in a structural and substantive change in our criminal law. Other major criminal reforms were also enacted around that time, including the creation of the unified court system which abolished the various local courts that had previously existed.

It is readily evident under the judicial and legislative reforms of 1975 and 1976 that the General Assembly intended to create a unified and progressive criminal system. Therefore, it is difficult to conclude that by enacting KRS 500.020(1)—a statute intended to solidify legislative authority—the General Assembly simultaneously intended to abdicate that authority to local governments. Such an interpretation contradicts the plain language and legislative history of KRS 500.020(1), and would create an absurd result. *Maynes,* 361 S.W.3d at 924 (this Court presumes that the General Assembly did not intend an absurd result). To do so would permit the circumvention of our penal code by the creation of countless satellites of criminal law in the scores of municipalities and counties within our state. Accordingly, the General Assembly cannot circumvent KRS 500.020(1) by enacting KRS 83A.065(2).

### Delegation of Legislative Authority

We recognize that the General Assembly may delegate much of its authority to local governments concerning the promotion of the public welfare. *See, e.g., Louisville & Jefferson County Bd. of Health v. Haunz,* 451 S.W.2d 407 (Ky.1970); Kentucky Const. § 156(b). Furthermore, the deprivation of private property rights through eminent domain, zoning, and annexation, are a few examples of sovereign authority that may also be delegated to local entities by the General Assembly. *See, e.g., City of Lebanon, Kentucky v. Elinor B. Goodin,* 436 S.W.3d 505 (Ky.2014); KRS 82.082. However, the deprivation of a citizen's liberty by incarceration is neither a plenary nor piecemeal power of the Commonwealth's subdivisions; rather, it is the sole

charge of the General Assembly, subject to the dictates of Kentucky and federal law. A rudimentary example of judicial process proves instructive.

In our criminal system, the court may lawfully impose a sentence of incarceration only after a jury unanimously finds the defendant guilty beyond a reasonable doubt. In contrast, the court may impose civil damages on a party after a majority of jurors assess liability on that party, typically by a mere preponderance of the evidence. Thus, when incarceration or confinement is at stake, the burden placed on the state is higher and the process that is due is greater. Kentucky Const. § 2; U.S. Const. Amendment XIV. This ancient principle guides not only the bench and bar, but all government institutions.

By further analogy, if the General Assembly ever vested local governments with the authority to enact felonies, the constitutional and public policy concerns would be immense. However, §§ 91.150 and 91.152 of the Ordinances authorize a maximum penalty of 12 months incarceration— the same minimum penalty authorized under a Class D felony. KRS 532.060(2)(d). In any event, it is not the duration of incarceration that offends the most basic notions of due process and liberty; rather, it is the mere act of authorizing confinement by an entity other than the state.

The authority to enact laws depriving citizens of their liberty by incarceration is the exclusive charge of the sovereign. In Kentucky, this authority is non-delegable and, therefore, may not be transferred to local governments. *Board of Trustees v. City of Paducah,* 333 S.W.2d 515, 518 (Ky. 1960) (holding that Kentucky does not recognize any inherent right to local government.). In arriving at this determination, I emphasize that this Court is unconcerned with the wisdom or efficacy of the General Assembly in enacting laws. Such concerns are the domain of the electorate. However, for a crime that carries a penalty of incarceration to satisfy the lowest threshold of constitutional muster, it must at least be a product of the legislature.

Furthermore, the enactment of criminal ordinances by local governments implicates serious separation of power concerns. Ky. Const. §§ 27, 28; *Glenn,* 436 S.W.3d at 188 (noting that "the separation of powers provisions of our Kentucky Constitution endow this Court with a unique mandate not present in our federal Constitution."). In the present case, Louisville Metro is essentially rewriting the Kentucky Penal Code and is, therefore, invading the province of the Legislature. The argument that the General Assembly intentionally abdicated its authority by enacting KRS 83A.065(2) does not obviate these concerns.

It is also important to note the astounding incongruity in criminal ordinances and punishments among various Kentucky municipalities. For example, violation of Lexington's vicious dog ordinance carries only a fine, a stark contrast to the Louisville Metro Ordinances at issue here. LFUCG Code of Ordinances Chapter 4, Article II, Section 4-14. A further review of the Louisville Metro Ordinances provides that while dog owners like Johnson may be convicted of a Class A misdemeanor, selling a firearm to a minor is only punishable as a Class B misdemeanor. Louisville Metro Ordinances §§ 135.04(B) and 135.99. Yet, in Newport, spitting on the sidewalk also constitutes a Class B misdemeanor. Newport, Kentucky Code of Ordinances §§ 131.24 and 131.99. Lastly, dyeing or selling dyed chicks or rabbits is a misdemeanor crime in Fort Thomas. Fort Thomas, Kentucky Code of Ordinances §§ 91.09 and 91.99. This is just a small sample of the cornucopia of crimes scat-

tered throughout the local law books of this Commonwealth.

Indeed, it appears that in many Kentucky cities and towns, prosecutorial discretion may be the only thing saving many of us from incarceration—and all of us all from absurdity. This illustrates the sound reasoning in requiring that criminal offenses punishable by incarceration, and the duration of confinement, must be specifically designated by statute.

### "Home Rule" and other Instructive Authority

We recognize the abundance of Kentucky law providing that cities and counties enjoy "home rule." KRS 82.082(1) ("A city may exercise any power and perform any function within its boundaries . . . that is in furtherance of a public purpose of the city and *not in conflict with a constitutional provision or statute.*") (emphasis added); KRS 67C.101(4) (the powers of consolidated governments such as Louisville Metro "shall be construed broadly in favor of the consolidated local government."). This authority is not dispositive in the present case. As previously discussed, KRS 83A.065(2) is inconsistent with KRS 500.020(1), our state and federal constitutions, and overarching public policy concerns. Therefore, the concept of home rule cannot legitimize the Ordinances at issue,

### Conclusion

The application of the Ordinances to the facts of this case is extreme. Johnson was convicted of a Class A misdemeanor and sentenced to 90 days in jail because her dog attacked another dog while under the supervision of her mother.

KRS 83A.065(2) is unconstitutional and invalid to the extent that it authorizes § 91.999 of the Ordinances or any similar ordinances which provide for a penalty of incarceration. § 91.999 is also invalid to the extent that it provides such a penalty. Yet, the assessment of fines under Chapter 91 of the Ordinances is analogous to a deprivation of a property interest, which, in this instance, may be lawfully delegated by the General Assembly to local governments. Public policy concerns also weigh heavily in favor of local governments possessing and exercising such power to maintain order and provide basic public services. Thus, KRS 83A.065(2) is valid only to the extent that is vests local governments with the authority to enact penal violations that impose monetary fines. We should so hold here today before untold others are convicted and sentenced to incarceration for crimes they did not commit.

Venters, J., joins.

### NOBLE, J., CONCURRING:

While we decide this case today on narrow statutory construction grounds, as we must, Justice Cunningham has sounded a clarion call to the legislature to remove any doubt as to where the authority to enact a criminal statute and fix its penalties lies. Surely the citizens do not expect to face disparate treatment from place to place for the same acts because one city makes certain conduct a crime, another merely makes that conduct a violation, and the legislature has not spoken on the criminal nature of the matter at all; and when state tax money for prosecutions and court system involvement is thus used disparately and at the whim of a local government. If the legislature was expressing a policy decision in allowing cities to enact *laws* instead of *ordinances,* then I can only think that policy not carefully thought out and ripe for revision. It would probably amaze the taxpayers in Pikeville, for example, to realize that some of their taxpayer money was being spent on courts and

prosecutions in Louisville, for example, based on a criminal charge that only the Louisville government had enacted. The same is true for any other set of taxpayers and any other cities in the same positions.