RENDERED: AUGUST 25, 2016
TO BE PUBLISHED

# Supreme Court of Kentucky

2014-SC-000353-MR

DATE 9/15/16 Kim Rudeson DC

DAVID ALAN JENKINS      APPELLANT

ON APPEAL FROM OHIO CIRCUIT COURT
V.      HONORABLE RONNIE C. DORTCH, JUDGE
NO. 06-CR-00121

COMMONWEALTH OF KENTUCKY      APPELLEE

## OPINION OF THE COURT BY JUSTICE HUGHES

## AFFIRMING IN PART, REVERSING IN PART, AND REMANDING

David Jenkins appeals as a matter of right from a Judgment of the Ohio Circuit Court convicting him of rape in the first degree (Kentucky Revised Statute (KRS) 510.040) and sodomy in the first degree (KRS 510.070). The Commonwealth accused Jenkins of committing those crimes against his seventeen-year-old step-granddaughter. The jury so found and recommended sentences of twenty years' imprisonment for both crimes, the sentences to be served consecutively. The trial court sentenced Jenkins in accord with the jury's recommendation to a total maximum term of forty years in prison. On appeal, Jenkins contends that the evidence adduced at trial was not sufficient to support the jury's verdicts and that, accordingly, he is entitled to a dismissal of the charges. He also contends that, even if the evidence was not so lacking as to require a directed verdict, a number of trial court errors rendered the

proceedings unfair and entitle him to a new trial. In particular, Jenkins contends that the trial court erred (1) by admitting evidence of Jenkins's prior bad acts; (2) by admitting into evidence statements Jenkins made during a post-polygraph interview; (3) by disallowing the introduction of additional statements from that interview; (4) by refusing Jenkins's request for a jury instruction on the offense of sexual misconduct; and (5) by instructing the jury on a single count of sodomy, when the evidence reflected two such acts. Agreeing with Jenkins on this last point, that the sodomy instruction does not comport with our recent cases construing the Kentucky Constitution's unanimous verdict requirement, we reverse the sodomy conviction and the sodomy portion of Jenkins's sentence and remand for additional proceedings. Finding none of his other contentions sufficient to undermine the verdict, we affirm Jenkins's rape conviction and corresponding twenty-year sentence for that crime.

## RELEVANT FACTS

The record indicates that in early 2006, the alleged victim in this case, "Jane,"[1] was residing at the Genesis Home in Mayfield, Graves County, Kentucky. At that time the Mayfield Genesis Home provided group-home services to girls. According to the Commonwealth, Jane had been sent there in conjunction with a juvenile prosecution. Jane revealed to one of the home's counselors that in September 2005, while Jane was seventeen, she had stayed

---

[1] Consistent with our practice, "Jane" is a pseudonym.

2

for a couple of days with her grandmother at her grandmother's home outside Fordsville, Kentucky, in Ohio County. Jane told the counselor that during her visit, her grandmother's husband, Jane's step-grandfather, David Jenkins, had forced her to engage in sexual acts, including intercourse. The counselor notified state authorities, and before long the case was assigned jointly to investigators from the Cabinet for Families and Children and the Ohio County post of the Kentucky State Police.

Those investigators, Cabinet worker Kerry White Kellman and then State Police Detective Bryan Whittaker,[2] arranged for a State Police detective stationed in Graves County, Detective Michelle Kent, to interview Jane at the Genesis Home. Detective Kent recorded the interview and forwarded both the recording and a transcript of it to the Ohio County investigators. In about May 2006, Kellman and Whittaker together interviewed Jenkins and his wife, Susan Jenkins, at their home. In July 2006, Jenkins agreed to take a polygraph exam. Immediately following that exam, Sergeant Whittaker interviewed him again. In August 2006, an Ohio County Grand Jury indicted Jenkins on charges of first-degree rape ("engag[ing] in sexual intercourse with a minor by forcible compulsion") and first-degree sodomy ("engage[ing] in deviate sexual intercourse with a minor by forcible compulsion").[3] The matter finally came to

---

[2] By the time of trial, Detective Whittaker had become Sergeant Whittaker.

[3] Notwithstanding the grand jury's phrasing, Jane's minority was not an element of the crimes with which Jenkins was charged.

trial before the Ohio Circuit Court in March of 2014, by which time Jane was twenty-five.[4]

At trial, the investigators testified concerning their roles leading up to the indictment. Although no mention was made of Jenkins's polygraph exam, over Jenkins's objection the Commonwealth was permitted to introduce during Sergeant Whittaker's testimony two brief excerpts, "snippets" as the Commonwealth referred to them, from the audio portion of Jenkins's post-polygraph interview. The Commonwealth argued that in these audio snippets Jenkins admitted having fantasized about Jane during her September 2005 visit, and admitted the possibility that under the influence of certain prescription medicines he could have engaged in sexual activity with Jane, but have been left with no recollection of it. (We address below Jenkins's objections to the post-polygraph evidence.) Otherwise, the Commonwealth's case rested entirely on the testimony of Jane.

Jane testified that she was born in May 1988 to parents who never married. Her father, she implied, had essentially abandoned her, but in her early years her paternal grandmother, Susan, had been very involved in her life and for some time had had regular, court-ordered visitation. According to Jane (and confirmed by Susan), Susan married Jenkins in about 1995, when Jane

---

[4] Although the record is by no means satisfactory on this point, it appears that over the intervening seven-and-a-half or so years Jenkins's trial was scheduled and continued nearly a dozen times, the majority of those continuances necessitated by the unavailability (for reasons undisclosed) of the complaining witness. The unusually long pre-trial delay has not been made an issue on appeal.

4

was about seven. Jane testified that at first she got along well with Jenkins. She was not asked explicitly when or why that relationship changed, but her testimony clearly implied that at some point Jenkins had begun sexually abusing her. She testified that she had reported the abuse both to the police and to school officials, but apparently nothing came of those allegations beyond the rupture of her relationship with her grandmother. Whether at her grandmother's insistence, or her mother's, or both (the testimony was not clear), Jane testified that in September 2005, when the incidents giving rise to this case occurred, she had not seen her grandmother or Jenkins for about four years.

According to Jane, on about September 15, 2005, she was visiting a friend in Pembroke, Kentucky when she began having significant pain in her mouth from what proved to be an abscessed tooth. Jane's mother, with whom Jane was living during that period, had recently moved to a new residence and did not yet have phone service, so Jane called her grandmother for help. Her grandmother and Jenkins came to Pembroke from Fordsville and took Jane to the hospital in Owensboro where a doctor examined her and prescribed an antibiotic. By then, apparently, it was fairly late in the day, but the three found an open pharmacy, had the prescription filled, and then proceeded to Susan and Jenkins's house. Jane remembered the three of them watching television for a little while that night, but believed that before long they had all gone to bed, a mattress having been provided for her in the living room. Jane testified that that night was uneventful.

5

She had little recollection of what they did during most of the next day. That evening, however, according to Jane, her grandmother had fallen asleep on the living room couch, and Jane had been allowed to use Susan and Jenkins's computer. She had played computer games and had written what she characterized as a "perverted" email to her boyfriend.

Jane testified that while she was using the computer, Jenkins was in and out of the computer room several times. While she was writing the letter to her boyfriend, Jenkins, she claimed, read the letter over her shoulder and made a remark to the effect, "You're the best because I made you the best." He also, at about that point, massaged her shoulders. Not long after that, Jane testified, Jenkins asked if he could take a picture of her. That request had not seemed inappropriate to her, and she complied. She became alarmed, however, when, shortly after the photo, Jenkins asked her if she "liked to be ate out," a reference, Jane knew, to oral sex. Jane testified that she did her best to ignore that remark and that soon thereafter Jenkins woke Susan from the couch and they all made preparations to go to bed. As they were parting for the night, however, Jenkins frightened Jane again by saying that he would "see you later."

Since Jane's testimony concerning what took place when Jenkins did indeed come back to see her early the next morning is the crux of the Commonwealth's case, we include the pertinent portions of that testimony verbatim, as follows:

> CW: [following a brief pause while the witness, who had become tearful, composed herself] OK. Are you ok now to go forward.

Jane: Yeah.

CW: We'd talked a little bit about back in September 2005. You'd gone to your grandmother's house, spent the night. Second day you were on the computer, talked to your step-grandfather, the defendant in this case, and he had said something to you about coming back. Did he come back?

Jane: Yes.

CW OK. Do you know about what time that occurred?

Jane: I want to say about 5:00, maybe.

CW: And where were you?

Jane: I was asleep on the air-mattress on the living room floor.

CW: Do you recall what you were wearing?

Jane: Pajamas. I don't remember specifically what kind.

CW: OK. And when did you first see the defendant?

Jane: Umm. He tried to wake me up. And I tried to act like I was asleep.

CW: How was he trying to wake you up?

Jane: He tapped me on my leg.

CW: OK. You said you tried to act like you were still asleep. What happened next?

Jane: It never worked. I'd tried it a lot, so it never worked.

CW: So what happened?

Jane: Umm. When he tried to wake me up, I ended up just waking up, and, um, he performed oral sex on me. And then [he] asked for it in return. Umm, and after that, he, I don't know the correct word in the courtroom to say. Um. He "had sex" with me, I guess.

CW: Alright. Let's kind of back up just a little bit. You said that once he woke you up. What specifically did he do at that time?

7

Jane: That's when he performed oral sex.

CW: OK. Now, let's kind of . . . What happened to your pajamas?

Jane: He just took my pants off.

CW: OK. He did . . . He did that?

Jane: Um huh.

CW: And then what did he . . . We've got to be very specific. You're going to have to tell this jury exactly what happened. OK? I know that's kind of difficult to do. What—he took your pants off—what happened next?

Jane: He went down on me.

CW: Is that something you wanted him to do?

Jane: No. I didn't want him to do that. [I] never wanted him to do anything to me.

CW: OK. Did you tell him that?

Jane: I told him that several times.

CW: What did you say, specifically?

Jane: I just told him "no."

CW: Did you resist him?

Jane: I couldn't really fight him. I felt like, . . . I guess going through it at seventeen, I thought I could handle it, that I was older and that, you know, that I was a little bad butt and I could fight back. Until I was put in that situation and I felt like I couldn't fight. I felt like I was helpless, and I was a little kid all over again.

CW: Were you scared?

Jane: Yeah.

CW: So, he takes your pants off?

Jane: Um huh.

CW: Step-by-step, what did he do?

Jane: After he took my pants off, he performed oral sex.

CW: When you say, "oral sex," what did he do?

Jane: He put his mouth on my vagina.

CW: Was that with your consent?

Jane: No.

CW: What happened next?

Jane: Umm. He asked me to go down on him.

CW: And did you do that?

Jane: Yes.

CW: OK. Why?

Jane: Umm. I don't know. I didn't want to, and I didn't feel comfortable to. It was just kind of, . . . It was always what happened. It was just something that I guess I was used to, 'cause that's always what happened.

CW: We can only talk about this time. What exactly . . . Where did he . . . What happened? You say, "oral sex." What do you mean? We have to be very graphic.

Jane: He put his penis in my mouth.

CW: OK. And did you want to do that?

Jane: No.

CW: Did you tell him that you didn't want to do that?

Jane: Yes.

CW: So, after that . . . How long did that last?

Jane: Not very long.

CW: How did it make you feel?

9

Jane: Like I was . . . I felt disgusted.

CW: What happened then?

Jane: Umm. He . . .proceeded to put his penis in my vagina.

CW: I understand. You're being graphic. I . . . That's exactly what we have to do. So, where were you when that happened?

Jane: Laying on the bed still.

CW: And how'd that make you feel?

Jane: I felt the same way. I felt disgusted. I didn't even want to be there. I didn't want to do that. I just wanted my grandma to wake up, or somebody. I just wanted somebody to walk in, and somebody just to catch it. And, never . . . It just never happened that way.

CW: How long did that last?

Jane: Not very long. The alarm clock ended up going off, and he went back in the bedroom. And I remember Susan asking, "What are you doing up already?" I don't remember what his response was. But I remember just going back, and them driving me to my court.

The prosecutor then asked Jane how she had come to report the incident, and he wound up his direct examination of her by asking,

CW: Are you telling this jury the truth?

Jane: Yes.

CW: Did he rape you?

Jane: Yes.

CW: Did he sodomize you?

Jane: Yes.

CW: Who did that?

10

Jane:  Dave Jenkins.

CW:  No further questions.

Defense counsel spent the first twenty minutes or so of his cross-examination trying to confront Jane with inconsistent statements she purportedly made to several people both before and after the alleged incident. He then questioned her as follows:

Def:  When he [Jenkins] came out to the living room, I guess, and woke you up, did he ever say anything to you?

Jane:  He never really said much during that time, no.  He just kind of rolled me over and pretty much, I mean, just took my pants off.

Def:  Did you ever say anything to him, to stop . . .?  Did you ever tell him to stop?

Jane:  I tried to block him several times.  And I told him "no."

Def:  Did you, uh . . . Now of course, this had been carried over from the day before.  Is that correct?

Jane:  No.  Nothing happened the first night.

Def:  Well, you mentioned that he was coming in the bedroom and making comments to you—in the computer room?

Jane:  Right.  That was the night before, but he didn't do nothing physically to me other than rub my shoulders and make comments.

Def:  Well, did you say anything to your grandmother?

Jane:  No.  She was asleep during all that time.

Def:  Did she wake up at any point?

Jane:  She woke up and went to bed.

Def:  Did you say anything to her before she went to bed?

11

Jane: No.

Def: Is there any reason why you wouldn't tell her about that?

Jane: Umm. I mean, I just figured he was . . . I mean, no, not really. I didn't have a reason to tell her or a reason not to tell her.

Def: OK. Now, did you consider David's comments inappropriate?

Jane: Umm. I really didn't pay 'em no attention. I could care less what he had to say, because I was still on the computer doing what I had to do on the computer.

Def: Well, did you like it that he rubbed your shoulders?

Jane: I mean, he wasn't touching me sexually, so . . .

Def: But you didn't feel good about it either?

Jane: It didn't bother me.

Def: Did he threaten you at all at any time?

Jane: No. He never threatened me.

Def: Did he hit you or hold you down?

Jane: Not that I recall. He never hit me. No.

Def: Did he ever keep you from getting up or walking away?

Jane: Not during when I was seventeen, no.

Def: OK. Did he ever cover your mouth to keep you from screaming out?

Jane: No.

Def: You said this was a double wide trailer?

Jane: Um huh.

Def: The wall's pretty thin?

Jane: I don't know; I didn't build it.

Def: You could have yelled out? You could have yelled out for your grandmother?

Jane: I probably could have. Yeah.

Def: Now, you also said he had you perform oral sex on him?

Jane: Because that's what he wanted. He asked me for it.

Def: So you did it?

Jane: Yes.

Def: He didn't make you do it?

Jane: He asked me for it, and, no, I mean . . .

Def: He didn't make you do it?

Jane: No. I put myself back to being a kid again. So, no, he didn't make me do it. It was just something that always happened, . . . so . . .

Def: Alright. Did you ever kick or punch David?

Jane: No.

Def: Did you ever try to hit him?

Jane: No.

After a few more questions meant to cast doubt on Jane's credibility, the cross-examination came to a close.

In pertinent part, the prosecutor's brief redirect-examination was as follows:

CW: Just a couple of questions. [Jane], when he was raping you, was that something you wanted to happen?

Jane: No.

CW: Did you consent to it?

13

Jane: No.

CW: Did you tell him to stop?

Jane: I told him, "no."

CW: Did he listen to you?

Jane: No.

CW: Did he just continue?

Jane: Yes.

At the close of the Commonwealth's proof and then again at the close of the defense proof, Jenkins moved for a directed verdict. He argued that the Commonwealth had failed to prove that either the alleged intercourse or the alleged sodomy had been forcibly compelled. The Commonwealth countered by recalling Jane's testimony to the effect that she was afraid of Jenkins, had told him "no," and had tried to block him. The trial court agreed with the Commonwealth that Jane's testimony allowed the jury to find that Jane had been forcibly compelled to engage in sex with Jenkins and so denied the defense motion. Jenkins, who testified at trial and denied having had any sexual contact with Jane, now contends that the facts the trial court apparently relied upon in denying his directed verdict motion do not add up to "forcible compulsion" as that term is statutorily defined for the purposes of KRS Chapter 510, the sexual offense chapter. We begin our analysis with that contention.

14

## ANALYSIS

**I. Jenkins Was Not Entitled to a Directed Verdict or to the Dismissal of Either Charge.**

As Jenkins correctly notes, the United States Supreme Court has held that the Due Process Clause of the Fourteenth Amendment "protects a defendant in a criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" *Jackson v. Virginia*, 443 U.S. 307, 315 (1979) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). The Supreme Court has also made clear, however, that *Jackson* did not alter the jury's fundamental role as finder of fact in criminal cases. In the context of direct appeals, the Court has explained that

> 'it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury.'

*Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (quoting *Cavazos v. Smith*, 565 U.S. 1, ___, 132 S. Ct. 2, 4 (2011)). "Under *Jackson*," in other words,

> evidence is sufficient to support a conviction if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'

*Coleman*, 132 S. Ct. at 2064 (quoting *Jackson*, 443 U.S. at 319). *See also Commonwealth v. Benham*, 816 S.W.2d 186-87 (Ky. 1991) ("On appellate review, the test of a directed verdict is, if under the evidence as a whole, it

15

would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.").

In pertinent part, the elements of first-degree rape are set forth in KRS 510.040(1)(a) as follows:

(1) A person is guilty of rape in the first degree when:

(a) He engages in sexual intercourse with another person by forcible compulsion.[5]

Jenkins does not dispute that the evidence was sufficient to create a jury question as to whether he engaged in sexual intercourse with Jane. He contends, however, that the Commonwealth failed to offer evidence of substance that he did so by "forcible compulsion."

KRS 510.010(2) defines[6] "forcible compulsion" as

Physical force or threat of physical force, express or implied, which places a person in fear of immediate death, physical injury to self or another person, fear of the immediate kidnap of self or another person, or fear of any offense under this chapter. Physical resistance on the part of the victim shall not be necessary to meet this definition.

Jenkins asserts that the Commonwealth failed to produce sufficient evidence that the alleged sex acts resulted from either "physical force" or "the

---

[5] KRS 510.070 outlaws sodomy in similar terms: "(1) A person is guilty of sodomy in the first degree when: (a) He engages in deviate sexual intercourse with another person by forcible compulsion." In pertinent part, "deviate sexual intercourse" is defined as "any act of sexual gratification involving the sex organs of one person and the mouth or anus another." KRS 510.010(1). Because the forcible compulsion element is common to both first-degree rape and first-degree sodomy, we limit our discussion of the directed verdict issue to the alleged rape, with the understanding that our discussion applies as well to Jenkins's claim that the sodomy charge should also have been dismissed.

[6] The quoted statutory provisions, which are the current versions, were also in effect in September 2005 when the offenses are alleged to have occurred.

16

threat of physical force . . . , which place[d Jane] in fear of immediate death [or] physical injury." We are convinced, however, that there was sufficient evidence of physical force to raise a jury question.[7]

As set out above, Jane testified that at the outset of the encounter Jenkins forcibly rolled her over, removed her pajama pants, and then physically pushed aside her several attempts to block him from sodomizing her. Jenkins's acts were not, as he maintains, actions merely incidental to sex. A reasonable jury could have believed them acts of physical force compelling sex despite the other person's unmistakable non-consent. They were not

---

[7] Jenkins devotes much of his discussion of this issue to the statute's other prong, the "threat of physical force" prong, and argues that while Jane testified that she was afraid and overwhelmed by bad memories, she did not testify to the sort of fear, the "fear of immediate death or physical injury," that the statute requires. He refers us to two of our recent cases, *Yates v. Commonwealth,* 430 S.W.3d 883 (Ky. 2014), and *Stowers v. Commonwealth,* 2014 WL 702180 (Ky. Feb. 20, 2014), as illustrating both the sort of threat that does not amount to forcible compulsion under KRS 510.010(2) (*Yates:* defendant threatened to reveal to the fourteen-year-old victim's mother the victim's relationship with her boyfriend) and the sort of circumstances necessary to permit an inference of a sufficient threat (*Stowers:* thirteen-year-old victim suddenly confronted by mother's boyfriend climbing into her bed). *See also Miller v. Commonwealth,* 77 S.W.3d 566 (Ky. 2002) (noting that rape defendant's statement to alleged victim that if she told anyone about the sexual activity both participants would get in trouble was not the sort of threat that would sustain a finding of "forcible compulsion"); David P. Bryden, *Redefining Rape,* 3 Buff. Crim. L. Rev. 317, 358 (2000) (noting that courts routinely assume that "[w]hen a stranger demands sex, . . . there is at least a tacit threat of force"); *Newcomb v. Commonwealth,* 410 S.W.3d 63 (Ky. 2013) (implicit threat of harm when casual friend appeared unexpectedly in victim's home and aggressively initiated sexual encounter). Jenkins insists that the vague fears and psychological unease about which Jane testified make this case more like *Yates* than *Stowers* and are not sufficient to permit a finding of forcible compulsion under the statute's "threat" prong. The question is an interesting one, to be sure, *cf. State v. Meyers,* 799 N.W.2d 132 (Iowa 2011) (considering, in a case also involving a seventeen year-old victim whose alleged attacker had abused her several years previously, whether the "force" element of a sex-abuse statute could be satisfied by psychological overpowering alone), but since we are convinced that there was sufficient evidence under the statute's other prong—physical force—we need not address it.

17

"violent" acts, perhaps, at least not violent in the sense of clearly threatening physical harm, but "forcible compulsion" does not require violence or duress or resistance by the victim. *Gibbs v. Commonwealth,* 208 S.W.3d 848, 856 (Ky. 2006) (discussing statutory amendments in 1988 and 1996 eliminating any requirement that the victim resist her attacker and holding that, in that case, the defendant's "act of taking [the victim's] hand and placing it on his penis" satisfied the physical force element, at least for the purpose of a directed verdict motion). *See also Gordon v. Commonwealth,* 214 S.W.3d 921 (Ky. App. 2006) (holding that testimony to the effect that the defendant pushed and held apart the twelve-year-old victim's legs in the course of sodomizing her satisfied, for directed verdict purposes, the "forcible compulsion" requirement).

Jane further testified that she continued to express her unwillingness throughout the encounter, but that Jenkins ignored her protests and subjected her to additional acts of sodomy and intercourse. Jane's testimony did not make clear whether she continued physically to try to block Jenkins's actions, but even if she did not, the additional acts all occurred in a brief period of time and so, one could reasonably infer, were just as compelled as the initial sodomy by the "continuum of force"[8] that Jenkins put in motion at the outset of the episode. Clearly, a reasonable juror who believed Jane's testimony to be credible could have concluded that Jenkins engaged in sexual intercourse with

---

[8] *Van Dyke v. Commonwealth,* 581 S.W.2d 563, 564 (Ky. 1979) (holding that separate acts of rape and sodomy constituted separate offenses, notwithstanding the fact that they occurred "in a brief period of time with the same victim and in a continuum of force").

her by forcible compulsion. The trial court did not err, therefore, by denying Jenkins's motion for a directed verdict. *Benham,* 816 S.W.2d at 186 (reiterating that the denial of a directed verdict motion will be upheld on appeal unless "under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt"); *Coleman,* 132 S. Ct. at 2064 ("Under *Jackson* . . . the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law. . . . [T]he deferential federal standard, . . . leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'") (quoting *Jackson,* 443 U.S. at 319).

## II. Jenkins's Sodomy Conviction Must Be Reversed Because the "Duplicitous" Jury Instruction Makes it Unclear Whether Jenkins Was Found Guilty By a Unanimous Verdict.

While we thus agree with the Commonwealth that Jenkins is not entitled to the dismissal of either charge, we must conclude that he is entitled to relief from his sodomy conviction. The jury instruction addressing that charge ran afoul of the rule articulated in *Johnson v. Commonwealth,* 405 S.W.3d 439 (Ky. 2013) and *Kingrey v. Commonwealth,* 396 S.W.3d 824 (Ky. 2013) which disallows so-called duplicitous instructions. He is not entitled to relief from the rape conviction, however, because Jane's allegations that Jenkins abused her when she was younger did not contravene Kentucky Rule of Evidence (KRE) 404(b), disallowing evidence of prior bad acts, and because Jenkins's other allegations of error fare no better. We first address the problem with the

19

sodomy instruction, and then explain why Jenkins's other allegations of error do not entitle him to any additional relief.

As noted above, Jane testified that prior to the rape Jenkins orally sodomized her and had her orally sodomize him. Jenkins was charged, however, with a single count of sodomy, and the jury instruction pertaining to that charge provided only that

> You will find the Defendant guilty of Sodomy—First Degree under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:
>
> 1. That in this county on or about September 15, 2005, and before the finding of the indictment herein;
>
> 2. He engaged in deviant sexual intercourse with [Jane]; and
>
> 3. That he did so by forcible compulsion.

During his closing argument, the prosecutor noted the evidence of two sodomies and told the jury that either one would justify a guilty verdict under this instruction.

Similar scenarios occurred in both *Johnson* and *Kingrey*. In *Johnson*, the defendant was charged with, and under a jury instruction comparable to the one at issue here was found guilty of, a single count of child abuse. The evidence, however, included proof of two distinct leg fractures that established that the child likely had been abused on at least two different occasions. In *Kingrey*, there was evidence that the defendant twice used a particular minor in a sexual performance, but the jury instruction alleged only one such crime and did not require the jury to specify a particular incident. In both cases we noted that the instructions were "duplicitous," *i.e.*, not deceitful, but rather double,

20

alleging either of two crimes in a single instruction.[9] We distinguished duplicitous instructions from so called combination instructions—instructions which allow the jury to agree that a particular set of actions by the defendant amount to a particular crime, but to disagree (when the evidence supports such disagreement) about which theory of the crime applies. Combination instructions, we explained, do not run afoul of the Kentucky Constitution's requirement that felony jury verdicts be unanimous,[10] because "no matter which theory they accepted, all the jurors convicted under a theory supported by the evidence and *all the jurors convicted the defendant of the same offense.*" *Kingrey*, 396 S.W.3d at 830. (emphasis supplied; citation and internal quotation marks omitted).

Duplicitous instructions, however, do not provide the same guarantee that all the jurors agreed as to the offense. Rather, a duplicitous instruction "allow[s] the jury to convict [the defendant] of one crime based on two separate and distinct criminal acts that violated the same criminal statute." 396 S.W.3d at 831. In that situation, we held, the "multiple theories" analysis is inapplicable, and the duplicitous instruction "violates the requirement of a

---

[9] Compare the pertinent part of the definition of "duplicity" in Black's Law Dictionary: "The pleading of two or more distinct grounds of complaint or defense for the same issue. In criminal procedure, this takes the form of joining two or more offenses in the same count of an indictment. Also termed *double pleading.*" BLACK'S LAW DICTIONARY, p. 578 (9th ed. 2009).

[10] Section 7 of the Kentucky Constitution guarantees felony defendants the right to a "trial by jury," and our Courts have long held that that right includes a right to the jury's unanimous verdict. *Johnson*, 405 S.W.3d at 448.

unanimous verdict," regardless of whether sufficient evidence existed of both criminal acts. *Id.*

In both cases, we held that the constitutional violation amounted to so manifest an injustice as to call for relief under Kentucky Rule of Criminal Procedure (RCr) 10.26, the palpable error rule. Extending that conclusion in *Martin v. Commonwealth,* 456 S.W.3d 1, 9-10 (Ky. 2015), we held that "all unanimous-verdict violations constitute palpable error resulting in manifest injustice."[11]

Given the proof of two sodomies in this case, the sodomy instruction quoted above, which allowed the jury to convict on the basis of either, as though they presented merely alternative theories of a single offense, breached the rule of *Johnson* and *Kingrey.* Under *Martin,* furthermore, the breach must be deemed a palpable error. In light of this authority, Jenkins's sodomy conviction, however well justified it may appear factually, must be reversed.

---

[11] These cases thus, implicitly at least, overrule much of *Ware v. Commonwealth,* 537 S.W.2d 174 (Ky. 1976), a case in which the defendant was charged with and convicted of a single count of rape, whereas the proof at trial tended to show that during the evening in question the defendant committed several sex offenses against the alleged victim, including a number of rapes. Rejecting the defendant's contention that the jury should have been admonished to limit the purposes for which it could consider the evidence of rapes other than the first one, the Court noted the frequency, in both adult-victim and child-victim cases, with which sex offenses occur in bunches, and broadly approved, in light of that reality, the prosecutor's use in that case of a single-count indictment, the introduction of extrinsic-act evidence inextricably a part of the charged offense's context, and the use of a jury instruction that "permit[ed] the state to prove its case in the alternative." 537 S.W.2d at 178.

### III. The Trial Court Did Not Err By Denying Jenkins's Request For a Sexual Misconduct Jury Instruction.

Jenkins next contends that for a number of reasons his rape conviction should be reversed as well. That conviction was rendered unfair, he insists, by the trial court's refusal to instruct on the lesser included offense of sexual misconduct and by trial court evidentiary rulings concerning both Jenkins's alleged prior bad acts against Jane and his responses during a post-polygraph interview. None of these alleged errors, we conclude, entitles Jenkins to further relief.

We begin with the alleged instructional error. KRS 510.140 provides (and provided in September 2005) as follows:

> (1) A person is guilty of sexual misconduct when he engages in sexual intercourse or deviate sexual intercourse with another person without the latter's consent.

> (2) Sexual misconduct is a Class A misdemeanor.

At trial, Jenkins requested an instruction based on this statute and argued that by requiring the element of intercourse without consent, but not the element of forcible compulsion, KRS 510.140 defines a lesser included offense of first-degree rape. The general rule, of course, is that, if requested, a trial court must give a lesser-included offense instruction if, but only if, "'considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond a reasonable doubt that he is guilty of the lesser offense.'" *Commonwealth v. Swift*, 237 S.W.3d 193, 195 (Ky. 2007) (quoting *Houston v. Commonwealth*, 975 S.W.2d 925, 929 (Ky. 1998)). Jenkins contends that a sexual misconduct

23

instruction was called for here because a reasonable juror could have believed that, although the sexual intercourse Jenkins imposed upon Jane was non-consensual (sexual misconduct), it was not forcibly compelled (rape). Jenkins's premise is wrong: as explained fully *infra*, sexual misconduct is not a lesser included offense of rape.

As Jenkins concedes, not long after the Penal Code went into effect (January 1, 1975), this Court was asked to construe the apparent overlap of KRS 510.140 with other statutes outlawing non-consensual intercourse and non-consensual deviant intercourse, the rape and sodomy statutes. The Court held that the sexual misconduct statute, with its misdemeanor penalty, was intended to apply only in cases where the victim's non-consent was premised on her age, and the perpetrator's young age, likewise—under eighteen if the victim was under sixteen but not under twelve, and under twenty-one if the victim was fourteen or fifteen—could be considered a mitigating factor. *Cooper v. Commonwealth*, 550 S.W.2d 478 (Ky. 1977).

The Court based this construction on the Commentary that accompanied the final draft of the Penal Code and that the General Assembly adopted along with the Code in 1974. As the Court noted, the Commentary explains that

> [t]he purpose in denominating such conduct between persons within the specified age groups as sexual misconduct rather than rape or sodomy is to eliminate an undesirable stigma. In such cases the defendant may well have been persuaded by the 'victim' to engage in the proscribed conduct. It seems unnecessarily harsh to have a defendant within the prescribed age limitation who has been convicted of such a statutory offense to bear a criminal record labeling him as a 'rapist' or a 'sodomist.' KRS 510.140 takes a more realistic approach to the penalty imposed while at the same time prohibiting the undesirable conduct.

24

*Cooper*, 550 S.W.2d at 479 (quoting Kentucky Penal Code, Final Draft, p. 138-39 (Nov. 1971)). As construed in *Cooper*, therefore, because both Jenkins and Jane were over the pertinent ages at the time of the alleged offenses, KRS 510.140 has no application to this case and did not allow for Jenkins's requested jury instruction.

In the four decades since *Cooper*, this Court has applied and reaffirmed the *Cooper* construction of KRS 510.140 a number of times, most recently in *Deno v. Commonwealth*, 177 S.W.3d 753 (Ky. 2005). *See also, Spencer v. Commonwealth*, 554 S.W.2d 355 (Ky. 1977); *Johnson v. Commonwealth*, 864 S.W.2d 266, 277 (Ky. 1993); *Iseral v. Commonwealth*, 2003 WL 22227193 (Ky. Sept. 18, 2003); *Campbell v. Commonwealth*, 2004 WL 314638 (Ky. Feb. 19, 2004). Nevertheless, noting that the Commentary could reasonably be read less categorically than the *Cooper* Court read it,[12] Jenkins contends that the *Cooper* Court's reading was, in fact, a misreading and asks us to reconsider it.

Implicitly relying on the principle of *stare decisis*, the principle that a court ought to "adher[e] to the law of decided cases," *Matheney v. Commonwealth*, 191 S.W.3d 599, 615 (Ky. 2006), (Cooper, J., dissenting), we have summarily declined similar requests in the past. *See e.g., Deno*, 177 S.W.3d at 762. Judicial economy might suggest that we do so again but given

---

[12] For example, the Commentary states that while preserving the concept of statutory rape is the "basic" purpose of KRS 510.140, the statute also "provides a useful plea-bargaining tool for the prosecutor in certain cases even though some degree of forcible compulsion or incapacity to consent may be present." Kentucky Penal Code, Final Draft, p. 138.

the concerns advanced by Jenkins and our dissenting colleagues, we explain why criticism of *Cooper* is inappropriate. In short, it was correctly decided.

The initial question before us is not, as Justice Venters seems to suggest, 'how is KRS 510.140, the sexual misconduct statute, to be construed?' The statute has already been construed. As noted above, nearly forty years ago the unanimous *Cooper* court, followed less than four-and-a-half months later by the unanimous decision in *Spenser,* observed that while the plain language ("[t]he bare wording," *Cooper,* 550 S.W.2d at 479) of that statute overlapped the other statutes outlawing rape and sodomy, the Commentary accompanying KRS 510.140 (Commentary expressly adopted by the General Assembly to aid in interpreting the then-new Penal Code) together with the scheme of rape and sodomy statutes, indicated that the overlap was not the General Assembly's intent.[13] Rather, the Court believed, the misdemeanor offense was intended merely to fill the gaps left in the statutory rape and statutory sodomy statutes (KRS 510.050(a), rape in the second degree; KRS 510.060(b), rape in the third degree; KRS 510.080(a), sodomy in the second degree; and KRS 510.090(b), sodomy in the third degree) for perpetrators too young to be guilty of the felony offenses. Thus understood, the sexual misconduct statute implicated neither

---

[13] As we have noted in numerous cases "[i]n construing statutes, our goal . . . is to give effect to the intent of the General Assembly." *Shawnee Telecom Resources Inc. v. Brown,* 354 S.W.3d 542, 551 (Ky. 2011). "[T]he cardinal rule of statutory construction is that the intention of the legislature should be ascertained and given effect." "*MPM Financial Group, Inc. v. Morton,* 289 S.W.3d 193 (Ky. 2009).

the equal protection nor the jury instruction questions advanced by the defendants in those first cases.

Given *Cooper* and *Spenser* and the long line of subsequent cases applying *Cooper,* the initial question before us, as Justice Cunningham implicitly acknowledges, is not whether the *Cooper* Court "got it right," *i.e.,* construed KRS 510.140 the way *we* would construe it in the first instance, but rather whether a settled precedent in our law should be undone. *Stare decisis,* as noted, is the doctrine or principle that courts should respect their own decisions. For if they do not, then why should anyone else? Justice Cooper's dissent in *Matheney, supra,* discusses at length the history of and rationales behind the *stare decisis* doctrine, the current understanding of which in the United States "is generally . . . that precedent is presumptively binding. In other words, *courts cannot depart from previous decisions simply because they disagree with them.* . . .However, judges may disregard precedent if they offer some special justification for doing so." 191 S.W.3d at 619-20 (citations and internal quotation marks omitted; emphasis in the original). *See also,* 191 S.W.3d at 623-25 (noting Kentucky cases in accord with that general understanding of the doctrine).

The escape hatch is necessary because, while judicial economy, stability, and legitimacy—values promoted by the *stare decisis* principle—are all of key importance, no less important is the assurance that the law not "be[] shackled to past folly." (Cunningham, J., dissenting) *See also, Allen v. Commonwealth,* 395 S.W.3d 451 (Ky. 2013) ("'[T]he doctrine of *stare decisis* does not commit us

27

to the sanctification of . . . fallacy.") (quoting *Morrow v. Commonwealth*, 77 S.W.3d 558, 559 (Ky. 2002)). Balancing these interests poses an obvious problem, inasmuch as the exception can easily be thought to swallow the rule.

Justice Brandeis reflected on the dilemma in his dissent in *Burnet v. Coronado Oil & Gas Co.*, 285 U.S. 393 (1932):

> Stare decisis is not, like the rule of res judicata, [a] universal inexorable command. The rule of stare decisis, though one tending to consistency and uniformity of decision, is not inflexible. Whether it shall be followed or departed from is a question entirely within the discretion of the court, which is again called upon to consider a question once decided. . . . Stare decisis is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than that it be settled right. . . . This is commonly true even where the error is a matter of serious concern, provided correction can be had by legislation. But in cases involving the Federal Constitution, where correction through legislative action is practically impossible, this court has often overruled its earlier decisions. The court bows to the lessons of experience and the force of better reasoning, recognizing that the process of trial and error, so fruitful in the physical sciences, is appropriate also in the judicial function.

285 U.S. at 405-08 (citations, internal quotation marks, and footnotes omitted).

This is a statutory and not a constitutional case, so the *stare decisis* interest is even stronger than it is in the constitutional cases to which Justice Brandeis referred. Simply put, in the forty years since *Cooper*, the Kentucky legislature could have "provided correction" if that decision were truly flawed, and it has not done so. Putting aside the statutory/constitutional distinction for the moment, however, have experience and the force of better reasoning truly reduced to "folly" the *Cooper* Court's construction of KRS 510.140? They have not.

28

The defendant in *Cooper*, as does Jenkins here, maintained that he was entitled to a jury instruction on sexual misconduct as a lesser offense included within the more serious rape and/or sodomy accusation. Under the *Cooper* Court's construction of KRS 510.140, limiting that statute to a subset of statutory rape/sodomy, the requested instruction was clearly not appropriate, since neither victim nor perpetrator was within the statute's supposed age limits. However, even construing KRS 510.140 as overlapping the rape and sodomy statutes, as Jenkins and the dissenters advocate, it would not entitle Jenkins to the misdemeanor jury instruction because it is *not* a lesser included offense.

The United States Supreme Court addressed the jury instruction issues posed by the "lesser-included offense doctrine" in *Sansone v. United States,* 380 U.S. 343 (1965). In that case, the defendant was accused of willfully attempting to evade federal income taxes, a felony under section 7201 of the Internal Revenue Code of 1954. In the circumstances of the case, that statute overlapped two misdemeanor provisions of the Code. The defendant sought jury instructions on the misdemeanors, but the trial court denied his request. The Court of Appeals for the Eighth Circuit affirmed. The Supreme Court accepted review "to consider the applicability of the lesser-included offense doctrine," 380 U.S. at 347, and it, too, affirmed.

As the Court explained, under Federal Rule of Criminal Procedure 31(c),

"[i]n a case where some of the elements of the crime charged themselves constitute a lesser crime, the defendant, if the evidence justifie[s] it . . . [is] entitled to an instruction which would permit a finding of guilt of the lesser offense." . . . But a lesser-offense

29

charge is not proper where, on the evidence presented, the factual issues to be resolved by the jury are the same as to both the lesser and greater offenses. . . . In other words, the lesser offense must be included within but not, on the facts of the case, be completely encompassed by the greater. A lesser-included offense instruction is only proper where the charged greater offense requires the jury to find a disputed factual element which is not required for conviction of the lesser-included offense.

380 U.S. at 349-50 (quoting *Berra v. United States,* 351 U.S. 131, 134 (1956), other citations omitted). In a footnote, the Court observed that otherwise, the instructions would only be inviting the jury to pick arbitrarily between the felony and the misdemeanor, an encroachment, the Court believed, on the judge's duty "to determine the punishment to be imposed." *Id.,* n.6.

A number of state courts have noted their agreement with *Sansone. See, e.g., People v. Cornell,* 646 N.W.2d 127 (Mich. 2002) (holding that Michigan's approach to lesser-included offense instructions is in accord with that of *Sansone); Royster v. State,* 622 S.W.2d 442 (Tex. Crim. App. 1981) (same for Texas). Of particular interest is New York's adoption of *Sansone* and application of the principle to the rape/sexual misconduct question because our sexual offense statutes are patterned on the New York statutes.[14]

---

[14] As we have noted many times, our Penal Code was heavily influenced by the Model Penal Code. *See, e.g., Johnson v. Commonwealth,* 449 S.W.3d 350, 354 (Ky. 2014) (Cunningham, J., concurring) (noting that the 1974 enactment of "much of the Model Penal Code" was part of a broader reform effort that included the creation of our unified court system); Dannye Holley, *The Influence of the Model Penal Code's Culpability Provisions on State Legislatures,* 27 Sw. U. L. Rev. 229 (1997) (noting that at least thirty-five states, Kentucky among them, adopted or revised their criminal codes in light of the Model Penal Code). However, for much of KRS Chapter 510, including its rape, sodomy, and sexual misconduct provisions, the General Assembly relied not on the Model Penal Code, but rather on Article 130 of the Penal Laws of New York. American Law Institute, *Model Penal Code and Commentaries,* Part II, § 213.1, p. 300 n.67 (1980) (noting that Kentucky, along with at least Alabama and Oregon, adopted provisions "virtually identical" to provisions in the New York statutes); Shapo,

30

> [T]he submission (to the jury) of a lesser degree or an included crime is justified only where there is some basis in the evidence for finding the accused innocent of the higher crime, and yet guilty of the lower one. . . . The trial court may not, however, permit the jury to choose between the crime charged and some lesser offense where the evidence essential to support a verdict of guilt of the latter necessarily proves guilt of the greater crime as well.

*People v. Richette,* 349 N.Y.S.2d 65, 68 (N.Y. 1973) (citing *Sansone;* other citations and internal quotation marks omitted).

The New York courts have held repeatedly that sexual misconduct, in a case where it overlaps the alleged felony offense, is "not a lesser included offense of [the felony] since an acquittal of the [felony] charge would also, as a matter of law, be an acquittal of the sexual misconduct charge." *People v. Maxwell,* 688 N.Y.S.2d 262 (App. Div. 1999) (citations and internal quotation marks omitted); *People v. McEaddy,* 330 N.Y.S.2d 65 (N.Y. 1972) (holding that acquittal of forcible rape charge precluded conviction of sexual misconduct for the same behavior); *People v. Cole,* 622 N.Y.S.2d 354, 356 (App. Div. 1995) (explaining that where the evidence is such that there is no elemental difference between the alleged felony offense, rape in the first degree, and the sexual misconduct misdemeanor, "[s]exual misconduct is *not* a lesser included offense of rape in the first degree," and hence the trial court did not err by refusing to instruct the jury on sexual misconduct).[15]

---

*Recent Statutory Developments in the Definition of Forcible Rape,* 61 Va. L. Rev. 1500, 1513 (1975) (contrasting the Model Penal Code and New York approaches and noting Kentucky, Hawaii, and Oregon's adoption of certain aspects of the New York provisions).

[15] This Court has indicated that sexual misconduct can be a lesser included offense of forcible rape when the jury might doubt the allegation of forcible compulsion but still find that the victim and the perpetrator were the right ages for the incapacity

The wisdom of the New York courts' approach is underscored by simply looking at the elements of first-degree rape and sexual misconduct as stated in our own statutes. As noted, Jenkins was convicted of first-degree rape under KRS 510.040(1) (a) based on his having "engage[d] in sexual intercourse with another person by forcible compulsion." The sexual misconduct statute, KRS 510.140, criminalizes "engag[ing] in sexual intercourse or deviate sexual intercourse with another person without the latter's consent." Jenkins and the dissenters obviously see some "daylight" between "forcible compulsion" and "without the latter's consent" but, in fact, there is none as a matter of law, at least not on these facts. "Lack of consent" is expressly defined in KRS 510.020 in pertinent part as follows:

> (1) Whether or not specifically stated, it is an element of every offense defined in this chapter that the sexual act was committed without consent of the victim.
> (2) Lack of consent results from:
> (a) Forcible compulsion;
> (b) Incapacity to consent; or
> (c) If the offense charged is sexual abuse, any circumstances in addition to forcible compulsion or incapacity to consent in which the victim does not expressly or impliedly acquiesce in the actor's conduct.

As for "incapacity to consent," in subsection (3) the statute deems the following persons incapable of consent: those who are less than sixteen years old, who have an intellectual disability or mental illness, who are mentally incapable or physically helpless, or who are in the custody of state or local authorities and

---

to consent form of the crime. *Johnson v. Commonwealth,* 864 S.W.2d 266 (Ky. 1993). This case does not present that scenario, and so we need not address that question here.

32

are abused by someone employed by that governmental authority. The incapacity to consent provision is clearly not applicable to Jenkins's charges nor is KRS 510.020(2)(c) because he has not been charged with sexual abuse.[16] So by process of elimination the ONLY form of lack of consent recognized under Kentucky law and applicable to this case is "forcible compulsion," KRS 510.020(a). With this simple process of statutory construction, it is patently clear that the rape statute criminalizes engaging in sexual intercourse with another by forcible compulsion and (absent the rule in *Cooper*) the sexual misconduct statute criminalizes the exact same conduct. Both offenses are reduced to (1) sexual intercourse and (2) forcible compulsion. Under the lesser-included offense doctrine, *Sansone*, 380 U.S. at 349-50, instructions on both offenses cannot be justified because the "factual issues to be resolved by the jury are the same as to both."

Kentucky has never had cause to adopt *Sansone* but it certainly is consistent with this Court's precedent regarding when a lesser-included offense instruction is justified. "[A]n instruction on a lesser included offense is required only if, considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond a reasonable doubt that the defendant is guilty of the lesser

---

[16] This subsection is, however, instructive. By including *for sexual abuse charges only* a form of non-consent "in which the victim does not expressly or impliedly acquiesce in the actor's conduct," our General Assembly has shown it knows how to provide a different definition if it chooses to do so. In fact, this definition appears to be what Justice Cunningham contemplates for the sexual misconduct statute but the legislature expressly limited it to sexual abuse charges.

offense." *Caudill v. Commonwealth*, 120 S.W.3d 635, 668 (Ky. 2004). *See also, Swift*, 237 S.W.3d at 195. Obviously, where the elements of the two offenses are identical it is impossible for a jury to have a reasonable doubt as to one offense (here, rape in the first-degree by forcible compulsion) but not as to the other (in this case, sexual misconduct through forcible compulsion).

So, statutory construction supports *Cooper* (which relied on legislative intent as discerned from the Commentary accompanying the statute), and New York precedent illustrates that the state from which we drew our sexual offense statutes long ago reached the same conclusion. Although that would seem to be more than enough to establish that "experience and the force of better reasoning", *Burnet*, 285 U.S. at 408, have not shown that *Cooper* was folly, we are compelled to note some obvious additional reasons for rejecting the dissenters' new reading of KRS 510.140.

A properly instructed jury, under the dissenters' theory, would receive both a rape and a sexual misconduct instruction but how would the jurors possibly distinguish between the two offenses, given that "without the latter's consent" would be defined under KRS 510.020 and the only applicable option would be by "forcible compulsion"? There would be no principled grounds for distinguishing the two offenses because guilt of one would equate with guilt of the other. Construing "without the latter's consent" as "something less" than forcible compulsion as Justice Cunningham suggests is not appropriate. Where the legislature has defined a term or phrase, as it has with "lack of consent," the courts are not free to ignore it. *Schroader v. Atkins*, 657 S.W.2d

34

945, 947 (Ky. 1983) ("When the General Assembly specifically provides that a word used in a statute shall have a particular meaning, the courts must accept that statutory definition in construing the statute even though the statutory definition is quite different from the ordinary meaning of the word.")

And once a jury convicted, how would the appellate court possibly respond to the defense argument that the jury should have seen what he did as sexual misconduct, a misdemeanor, and not rape, a felony? When that type of error is raised, appellate courts typically survey the evidence and apply the statutory elements to determine if a reasonable juror could find guilt beyond a reasonable doubt. *Benham*, 816 S.W.2d at 186-87. By what standard would that thorny issue be judged when the elements of the two offenses are the same as a matter of law? Finally, and most concerning of all, this new reading of KRS 510.140 would mean that this Class A misdemeanor offense would be an option in the jury instructions in many, if not most, rape and sodomy cases premised on forcible compulsion, and the jury would be invited to make up their own standards of "bad" forcible compulsion versus "not so bad" forcible compulsion in order to distinguish the charged offense of rape or sodomy from sexual misconduct. Surely, most surely, that cannot have been the legislative intent.

As Justice Brandeis noted all those years ago in *Burnet, stare decisis* is usually the wise course. It is so here.

## IV. The Trial Court Did Not Err By Allowing Evidence of "Same Victim" Prior Bad Acts.

35

We turn now to Jenkins's allegations of evidentiary error, beginning with his claim that Jane's testimony relating the alleged 2005 episode of sodomy and intercourse to similar episodes in the past ran afoul of KRE 404(b)'s disallowance of evidence of extrinsic acts reflecting adversely on the actor's character. Because Jane's testimony was relevant to and sufficiently probative of material issues in the case and did not merely cast a bad light on Jenkins's character, the trial court did not abuse its discretion by allowing the testimony.

Before trial, the Commonwealth gave notice, pursuant to KRE 404(c), that it intended to introduce evidence that Jenkins had "in the past," committed acts against Jane similar to those with which he was then charged. The Commonwealth also noticed its intent to introduce evidence that in 1992 Jenkins had been convicted in Ohio of "gross sexual imposition" for forcibly touching a female relative in a sexual manner. Jenkins moved to exclude both types of evidence. He argued that the Ohio matter was too temporally remote to be relevant, and that the allegations regarding Jane had never been substantiated or prosecuted and thus would be unduly prejudicial. The trial court granted Jenkins's motion with respect to the Ohio charge, thus disallowing mention of it during the guilt phase of the trial, but it ruled that Jane could testify regarding Jenkins's alleged mistreatment of her while she was between the ages of approximately seven to thirteen. The court answered defense counsel's objection by assuring him that he could cross-examine Jane concerning how her prior accusations had been received. For his part, the

prosecutor assured the court that he would stay as clear of the earlier allegations as he could and would touch upon them only "very lightly."

As noted, Jane testified at trial that when Jenkins woke her the morning of the offenses, she at first pretended not to wake up, in hopes that he would give up and go away. But, she testified, "It never worked. I tried it a lot. So, it never worked." Later, when she was asked if, despite not wanting to do so, she had sodomized Jenkins merely because he had asked her to, she testified,

Jane: Yes.

Def: He didn't make you do it?

Jane: He asked me for it, and, no, I mean . . .

Def: He didn't make you do it?

Jane: No. I put myself back to being a kid again. So, no, he didn't make me do it. It was just something that always happened.

When later defense counsel wondered why Jane had waited so long (from September 2005 until the beginning of 2006) to report the incident, Jane retorted that she had not delayed, that she had reported earlier incidents to school authorities and to the police.

The earlier allegations also came up during the Commonwealth's cross-examination of Susan Jenkins, Jane's grandmother and the defendant's wife. Susan agreed that she had had a close relationship and a great deal of contact with Jane until Jane was about thirteen or fourteen years-old, but at that point the relationship had been severed abruptly. Susan elaborated that the severing had been her choice, that she had come to feel that Jane was not to be trusted. The Commonwealth responded along the lines of, "Or at least

37

somebody in the household was not to be trusted?" At that point, a defense objection moved the questioning in a different direction.

Jenkins contends that the jury would have attributed to him these and a couple of other references to Jane's having been subjected to sexual contact at an earlier age, notwithstanding the fact that the attribution was never made express or the allegations specific. He insists that as references to him this prior-act evidence violated KRE 404, which addresses character evidence and evidence of other crimes. In response, the Commonwealth asserts that Jane's "cryptic" references to prior abuse would not have been attributed to Jenkins and so do not implicate the character evidence rule. On the question of attribution, we must agree with Jenkins.

As set out in detail above, although Jane never referred to her prior abuser by name, she indicated clearly enough that it was an earlier pattern of activity with Jenkins that she found herself slipping back into against her will. The prosecutor himself laid to rest any possibility of doubt on that score when, during his cross-examination of Susan Jenkins, he implied that David Jenkins, not Jane, was the reason Jane stopped being a visitor at Susan's house. KRE 404 applies, moreover, even to "suggestive references to the defendant's prior crimes, wrongs, or bad acts." *Wiley v. Commonwealth,* 348 S.W.3d 570, 581 (Ky. 2010). Jenkins is correct, therefore, that KRE 404 applies, but we ultimately agree with the Commonwealth that Jane's testimony did not violate that rule.

In pertinent part, KRE 404 provides that

[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:

(1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or

(2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

KRE 404(b).

The rule protects against the introduction of extrinsic act evidence when that evidence is offered solely to prove character, or criminal disposition, the concern being that juries are unduly susceptible to that type of evidence. *Bell v. Commonwealth*, 875 S.W.2d 882, 889 (Ky. 1994). The rule does not, however, preclude the use of extrinsic act evidence for proper purposes, such as the purposes listed in KRE 404(b)(1) and 404(b)(2). To help with the often difficult distinction between proper and improper uses of extrinsic act evidence, the *Bell* Court (following a suggestion by Professor Lawson) recommended the assessment of such evidence by means of a three-part inquiry into relevance, probativeness, and prejudice.

With respect to relevance, the assessing court asks, is the evidence relevant "for some purpose other than to prove the criminal disposition of the accused?" *Bell*, 875 S.W.2d at 889. Aside from showing criminal propensity, that is, the extrinsic act evidence must bear *materially* on an element of the offense or on some other fact actually in dispute. *Southworth v. Commonwealth*, 435 S.W.3d 32 (Ky. 2014) (noting that prior act evidence tending to show the defendant's knowledge of a process did not pass the

relevance inquiry because the process had not been shown to bear materially on the case); *but cf. Estelle v. McGuire,* 502 U.S. 62 (1991) (noting that, generally, material evidence is not rendered immaterial by the defendant's decision not to contest it).

The court should also consider whether the extrinsic act evidence is "sufficiently probative," *Bell,* 875 S.W.2d at 890, *i.e.,* could the jury "reasonably infer that the prior bad acts occurred and that [the defendant] committed such acts[?]" *Parker v. Commonwealth,* 952 S.W.2d 209, 214 (Ky. 1997) (citing *Huddleston v. United States,* 485 U.S. 681, 689 (1988), which discusses the virtually identical federal rule). In *O'Bryan v. Commonwealth,* 634 S.W.2d 153, 157 (Ky. 1982 ), for example, the Commonwealth alleged that the defendant had murdered her husband by poisoning him with arsenic, but it was not allowed to introduce evidence that her former husband died from arsenic poisoning because there was "no evidence of a substantial nature to indicate that [the defendant] committed such crime."

And finally, the court asks, is the extrinsic act evidence unduly prejudicial, that is, is the tendency of the evidence so strongly to lead the jury into improper character inferences that that tendency "substantially outweigh[s] [the evidence's] probative value" with regard to its proper uses? *Bell,* 875 S.W.2d at 890.[17] In *Bell* itself, a case in which the defendant was

_____

[17] It should be noted that, technically, the prejudice/probative value inquiry under *Bell* and KRE 404(b) is a part of, but not necessarily all of, the prejudice/probative value inquiry required under KRE 403, which applies to relevant evidence generally and which allows for exclusion notwithstanding relevance when the evidence would be unduly prejudicial for any reason, not just because it invites an

charged with sodomy against his girlfriend's child, the Commonwealth was allowed to introduce testimony by the alleged victim's older sibling, testimony to the effect that the defendant had also perpetrated two acts of sodomy against him. Using its three-inquiry analysis, the Court held that the older sibling's testimony should not have been admitted. In the Court's view, the acts the older child alleged did not bear a close enough resemblance to the acts allegedly perpetrated against the victim to suggest much more than that the defendant was disposed to commit that class of crime, the very sort of character-based implication that KRE 404 is meant to preclude. Because the risk of undue prejudice was thus high and the legitimate probative value of the evidence low, if any, the third part of the *Bell* analysis indicated that the older sibling's evidence ought not to have been allowed.

Unlike *Bell*, however, this case involves extrinsic acts perpetrated not against an "extrinsic" victim, as it were, but rather against the same person allegedly the victim of the crimes for which the defendant is being tried. Evidence of similar acts perpetrated against the same victim, we have noted many times, is "almost always admissible," under KRE 404(b), because it will almost always be significantly probative of a material issue aside from the

---

improper character inference. Trial courts thus should be mindful that the prejudice/probative value inquiry under KRE 403 is potentially broader than the similar inquiry *Bell* suggests is required under KRE 404(b). That does not mean, however, that in practice the two inquiries (if, indeed there are two inquiries) cannot be merged, as they often are. *See, e.g., Soto v. Commonwealth*, 139 S.W.3d 827, 859 (Ky. 2004) (noting that the effect of remoteness on the probative value of a prior bad act is part of the KRE 403 balancing test, but suggesting that balancing need be assessed only once); *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999) (same).

defendant's character. *Noel v. Commonwealth,* 76 S.W.3d 923, 931 (Ky. 2002). *See also, e.g., Harp v. Commonwealth,* 266 S.W.3d 813 (Ky. 2008); *Driver v. Commonwealth,* 361 S.W.3d 877 (Ky. 2012); *Lopez v. Commonwealth,* 459 S.W.3d 867 (Ky. 2015). That does not mean, of course, that evidence of prior acts against the same victim is automatically admissible—relevance to a material issue and probativeness must be shown, and the possibility of undue prejudice must still be considered—but our experience with these cases has taught that in most of them the *Bell* inquiry leads to admission.

This case is no exception. As is often the case when sex offenses are alleged, one of the principal issues was whether a crime occurred at all. Jane alleged that Jenkins forced her into sex acts, while Jenkins denied sexual contact altogether. Relevant to that issue was whether Jenkins had a motive to do as Jane alleged, and Jane's testimony to the effect that Jenkins had done similar things to her during her childhood (seemingly without consequence) tended to show that Jenkins did indeed find Jane attractive as a vulnerable object of his sexual impulses. In this instance, therefore, Jane's "same victim" testimony served not as propensity evidence tending to show merely that Jenkins had a propensity for this type of crime; it related rather to this particular crime by tending to show that Jenkins had a motive involving this particular victim.

Jane's prior-act testimony was also relevant to another material issue. KRS 510.020 makes "lack of consent," as statutorily defined, an element of every offense defined in KRS Chapter 510. The Commonwealth alleged that in

42

this case the lack of consent resulted from forcible compulsion. Jane herself testified, however, that while she repeatedly told Jenkins that she did not want to engage in sex with him and physically resisted his advances, her response was largely passive. Jane's very limited prior-act testimony about childhood abuse bore on that passivity and was likely to help the jury assess the manner of Jane's response to this episode and to determine whether her participation was forcibly compelled. The prior-act testimony was relevant, therefore, to the material issue of consent/forcible compulsion. For both reasons, Jane's prior-act testimony was relevant "for some other purpose" and was not excludable as mere evidence of bad character.

With respect to the *Bell* "probativeness" factor, Jane's testimony was sufficient to permit a reasonable juror to conclude that the prior act occurred and that Jenkins was the actor. *Purcell v. Commonwealth,* 149 S.W.3d 382, 400 (Ky. 2004) (noting that "[t]he testimonies of [alleged prior victims of sex offenses] satisfied this [the "probativeness"] aspect of the test.").

Relevance and probativeness, of course, do not exhaust the *Bell* analysis. As we noted in *Newcomb v. Commonwealth,* 410 S.W.3d at 77, under Bell's third step, "a trial court should exclude evidence otherwise admissible under KRE 404(b) if its probative value is substantially outweighed by the danger of undue prejudice." The *Bell* Court thought it axiomatic that a risk of undue prejudice (the forbidden character inference) is inherent in prior-bad-acts evidence and so urged trial courts to "apply the rule [KRE 404(b)] cautiously." *Bell,* 875 S.W.2d at 889. That risk will vary to some extent with the

43

opprobrium attached to the prior act, *i.e.,* the degree to which the evidence is apt to "rouse the jury to overmastering hostility." *Newcomb,* 410 S.W.3d at 77 (citation and internal quotation marks omitted).[18] As Professor Lawson notes, the risk of undue prejudice may be mitigated in some cases by an admonition limiting how the prior act evidence may be used, Lawson, § 2.30[2][d], and also by limiting "how much the jurors are permitted to hear about 'other crimes.'" *Id.*

A wide variety of factors can bear on the probative value of the prior-crime evidence,

> including the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, [and] the efficacy of alternative proof.

*Newcomb,* 410 S.W.3d at 77 (quoting *McCormick on Evidence,* Ch. 17 § 190 (citations omitted)). Among these factors, the proponent's need for the other-crime evidence is of particular importance, since "it is 'the incremental probity of the evidence that is to be balanced against its potential for undue prejudice.'" Lawson, § 2.30[2][d] (quoting *United States v. Beechum,* 582 F.2d 898, 914 (5th Cir. 1978)). At the end of the day, however, the trial court has a great deal of discretion in carrying out the balancing, and its ruling will not be

---

[18] Kentucky has thus far rejected modifications to the Federal Rules of Evidence—federal rules 413, 414, and 415—that in essence create an exception to Rule 404(b) for evidence of prior sex crimes. This Court has, however, at least with respect to "same victim" cases, expressed for the most part "a very liberal attitude toward the admissibility of other crimes evidence." Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 2.30[5][e] (5th ed. 2013) (hereafter, Lawson).

44

disturbed absent an abuse thereof. *Bell,* 875 S.W.2d at 890; *Commonwealth v. English,* 993 S.W.2d at 945. There was no abuse of discretion here.

The "incremental probity" of Jane's prior-act testimony was substantial, because it gave the jury insight it otherwise would not have had into a possible motive for Jenkins's seemingly out-of-the-blue sexual assault on his seventeen year-old step-granddaughter. Indeed, the need for prior-crime evidence of motive "is greatest and [its] relevance is clearest when the defense is denial of the criminal act." Lawson, § 2.30[4][e]. Jane's prior-act testimony also provided key contextual evidence bearing on the issue of forcible compulsion, an issue of some subtlety and complexity in this case.[19]

On the prejudice side of the balance, the prior acts were not unduly emphasized by repeated mention or excessive detail, and Jenkins was granted a full opportunity to contest Jane's prior-act allegations. The probative value being substantial, and the risk of undue prejudice being recognized and mitigated, such that it did not substantially outweigh the former, the trial court's decision to admit Jane's limited prior-act testimony was not an abuse of discretion.[20]

---

[19] As an important aspect of Jane's account of the current 2005 offenses, the prior acts from her childhood could arguably be deemed "inextricably intertwined" with them and could thus be thought to implicate KRE 404(b)(2) as well as 404(b)(1). We need not pursue that possibility, however, since admission of Jane's testimony under section 404(b)(1) was appropriate.

[20] Jenkins contends that his forty-year sentence, the maximum possible sentence for the crimes of which he was convicted, indicates that the prior-act testimony proved prejudicial at sentencing. This argument confuses different senses of the word "prejudice" and different standards of review. Had the trial court erred by admitting the prior-act testimony, the effect of that testimony would have been relevant to a consideration of whether the error was harmless, say, or palpable.

45

## V. The Trial Court Did Not Abuse its Discretion By Allowing Into Evidence Portions of Jenkins's Post-Polygraph Interview.

### A. The Interview Evidence Did Not Impose an Unconstitutional Burden on the Exercise of Jenkins's Rights.

Finally, Jenkins contends that the trial court erred by allowing the Commonwealth to introduce into evidence statements he made in the course of a post-polygraph interview. As noted above, in July 2006 Jenkins voluntarily submitted to a polygraph exam. At the conclusion of the exam, Jenkins was advised that there had been some deceit, and he was referred to the lead detective, Bryan Whittaker. Whittaker then questioned Jenkins about the "failed" exam. Prior to trial, Jenkins moved to exclude any reference to the polygraph exam, including any reference to the post-exam interview.

---

Generally, however, properly admitted evidence simply has the effect that it has; it does not become improperly admitted because the jury happens to give it weight. The *actual* prejudice that pertains to harmless-error and to palpable-error analysis should not be confused with the *potential* for undue prejudice that bears upon a court's admissibility ruling under KRE 403 and 404.

That said, we certainly agree with Jenkins that the risk of punishment for an uncharged prior bad act is one of the main reasons courts are to treat KRE 404(b) evidence cautiously. It is also one of the main reasons an admonition limiting how the jury may use such evidence might well be appropriate in a given case. In this case, as noted above, the trial court's KRE 404(b) ruling was duly considered and was within the court's discretion. Jenkins did not request a limiting admonition. See KRE 105(a) ("[U]pon request" a trial court shall admonish the jury with respect to the permissible use of "limited admissibility" evidence.). The prosecutor's guilt-phase closing, moreover, made no direct and little indirect reference to Jenkins's alleged prior acts. It certainly did not harp on them. Instead, the prosecutor focused on Jane's having no reason to fabricate her allegations, and on the seriousness of these charges.

During the sentencing phase, the Commonwealth introduced Jenkins's 1992 Ohio conviction for gross sexual imposition, and then it did indeed argue, again without any direct reference to Jane's prior-act allegations, that a repeat sex offender merited the maximum sentence. In their totality, the circumstances simply do not suggest that these proceedings were rendered unfair or unjust by the admission during trial of Jane's KRE 404(b) testimony.

46

The Commonwealth agreed that reference to the exam itself would be improper, but it argued that, once redacted so as not to mention or imply the polygraph exam, Jenkins's post-exam statement was admissible. It advised Jenkins and the court, furthermore, that it had prepared some duly sanitized "snippets" from the audio portion of Jenkins's interview and intended to introduce them during Whittaker's testimony.

Jenkins objected to the introduction of any interview "snippets" and argued, essentially, that the post-exam interview was so inextricably intertwined with the polygraph that redacting that exam from the interview would inevitably give the jury a false impression of the interview, whereas any attempt adequately to explain the context of the interview would inevitably expose the jury to the polygraph exam. In light of this alleged dilemma, Jenkins moved to exclude the Commonwealth's proposed interview evidence. The trial court overruled the defense objection, but noted that the Commonwealth's "snippets" would be subject to the rule of completeness in its present guise as KRE 106 ("Remainder of or related writings or recorded statements").

As promised, during Sergeant Whittaker's direct examination, the Commonwealth introduced two excerpts from Jenkins's post-polygraph interview. We have reproduced the pertinent portions of the interview with the

47

excerpts introduced by the Commonwealth in bold.[21] The interview began with Jenkins asserting that he had told the examiner the truth, notwithstanding any indication to the contrary by the polygraph machine. Whittaker greeted him with, "So, [Mr. Jenkins], what are we gonna do now?" The transcript of the ensuing interview fills some thirty pages. In the course of the interview, Jenkins asserted repeatedly that he told the truth during the polygraph exam and that he "never touch[ed] that girl." Jenkins followed one such denial by saying, "Now, maybe, in my mind, I might have wanted to at one time when she was good looking or something like that, but I have never touched that girl." The detective continued as follows:

> Det. Whittaker: Is that what was going through your mind, you think?
>
> Jenkins: I don't know, maybe. But I have never touched that girl. She's my granddaughter, for God's sake.
>
> Det. Whittaker: She's your step-granddaughter; that's a big difference.
>
> Jenkins: I look, I look at it like she's my real granddaughter.
>
> Det. Whittaker: Uh hm. So maybe that's what screwed up the test. **Have you had fantasies about [Jane]?**
>
> **Jenkins: No, not really.**
>
> **Det. Whittaker: Not really? What's that mean?**
>
> **Jenkins: Just, well, you know what happens when you . . .**
>
> **Det. Whittaker: I know. That's, that's what I'm saying. Tell**

---

[21] We have also indicated by means of underlining those portions of the interview Jenkins sought to have admitted pursuant to KRE 106. Jenkins's motion and the trial court's ruling are discussed below.

me about what you think might have went through your head while he was asking you these questions.

**Jenkins:  She's gotten big, bigger and everything and . . .**

**Det. Whittaker:  What [inaudible]**

**Jenkins:  She's more developed than what she was.**

**Det. Whittaker:  She used to look better—is that what you're saying—than she does now?**

**Jenkins:  Yeah, a lot better.**

**Det. Whittaker:  When did she start getting bigger?**

**Jenkins: [inaudible] That's before, before, uh, this last episode when she stayed two nights at our house.**

**Det. Whittaker:  Uh hm.**

**Jenkins:  I hadn't seen her in four years.**

Det. Whittaker:  I think that's pretty much what she said.  She hadn't been over in a while.  You think that, maybe that's what screwed up the test then?

Jenkins:  It could, may, maybe, you know [inaudible], yeah.  But I have never touched her, and I'll swear that before God on a stack of Bibles.  I promise you I did never touch that girl.

After that exchange, Detective Whittaker confronted Jenkins with the possibility that he (Jenkins) and Jane had had consensual sex, that for some reason Jane had changed her mind about it, and that now Jenkins was reluctant to admit his mistake to his wife and to the other members of his church.  Jenkins reiterated, however, that "I don't remember ever having sex with her, I don't." . . .

Det. Whittaker:  So you don't remember?

Jenkins:  I ain't never, ever.

49

Det. Whittaker:  What about your medication?

Jenkins: What about 'em?

Det. Whittaker: Ain't you had stuff to make you [inaudible] there at the time?

Jenkins:  One of them was a [inaudible] sleep.

Det. Whittaker:  Is there anything in your sleep that you don't, you know—you see what I'm getting at here?  There may be a medication problem.  **You've already told me you've had, you've had these thoughts about [Jane].**

**Jenkins:  Yeah.**

**Det. Whittaker:  Alright, so your subconscious is working against you.**

**Jenkins:  I have about, I have about a lot of women.**

**Det. Whittaker:  No, I mean . . .**

**Jenkins:  But that doesn't mean I put my hands on them.**

**Det. Whittaker:  A lot of women don't come in your house and spend the night.  So, there she is, sleeping in the living room.  If you get your medication, and your subconscious is already working against you here: . . . See what I'm getting at?  Is that possible?**

**Jenkins:  It's possible.**

**Det. Whittaker:  Well that could explain it.**

**Jenkins:  But I don't remember anything.**

**Det. Whittaker:  Okay, I think we're getting closer to the truth now.**

**Jenkins:  I think it is possible.  I didn't think about that, but it is possible.**  But I swear to you on a stack of Bibles I never put my hands on her, never.

Det. Whittaker: But you just told me it was possible you might,

50

could, might, maybe, could have done it after you took your medication.

Jenkins: In my mind, maybe, I don't . . . maybe, I don't, I don't know, I don't know. My [inaudible]

Det. Whittaker: Well, that's what I'm getting at. You got a lot of health problems; you're taking a bunch of medication, you know; there she is laying on the floor.

Jenkins: [inaudible]

Det. Whittaker: But it's possible after you took this medication something could have happened. Of course your sub . . ., you know, whether you, you're trying not to remember it or what happened . . ., you know, we know it did, so you gotta get it right in your head and tell me what exactly happened. You remember parts of it at all, any of it?

Jenkins: No, I don't remember me leaving the room.

The interview continues for approximately another ten transcript pages, and during that questioning Jenkins concedes, in effect, another four or five times that "like you said, the medication and everything, it's, there's a poss[ibility]." He reiterates each time, however, that, "I'm serious, I really don't remember it."

Jenkins contends that the trial court abused its discretion in conjunction with this post-polygraph evidence,[22] and he offers two reasons for doing so, one based on a supposed constitutional violation and one based on the rule of completeness. Ultimately, neither is compelling.

_____

[22] As the parties correctly note, "[t]he standard of review for a trial court's evidentiary rulings is abuse of discretion. . . . The test for abuse of discretion is 'whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles.'" *McDaniel v. Commonwealth*, 415 S.W.3d 643, 655 (Ky. 2013) (citing *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575 (Ky. 2000) and quoting *Commonwealth v. English*, 993 S.W.2d 941 (Ky. 1999)).

First, expanding upon the "dilemma" argument he made to the trial court, Jenkins insists that introduction of the post-polygraph evidence put him "in a position where he . . . had to give up his constitutional right to defend himself [by explaining to the jury the context of his "fantasy" and "it's possible" statements] in order [to exercise his constitutional right] not to be convicted based on unreliable polygraph evidence." The trial court, thus, according to Jenkins, forced him to surrender one constitutional right in order to assert another, contrary to the Supreme Court's statement in *Simmons v. United States*, 390 U.S. 377, 394 (1968), that such a choice between constitutional rights is "intolerable."

Even aside from his rather free-wheeling declaration of constitutional rights, we think Jenkins has overstated his "dilemma." The Supreme Court itself, after all, has qualified *Simmons* (which involved the prosecution's use at trial of the defendant's testimony at a suppression hearing) by noting that

> the Constitution does not forbid 'every government-imposed choice in the criminal process that has the effect of discouraging the exercise of constitutional rights.' . . . The 'threshold question is whether compelling the election impairs to an appreciable extent any of the policies behind the rights involved.'

*Jenkins v. Anderson*, 447 U.S. 231, 236 (1980) (quoting *Chaffin v. Stynchcombe*, 412 U.S. 17, 30 (1973) other citations and internal quotation marks omitted). The Court has also rejected the idea that interrogations following a polygraph exam are inherently and unduly coercive. *Wyrick v. Fields*, 459 U.S. 42, 49 (1982) (reversing an Eighth Circuit holding to that effect

and characterizing post-polygraph interviews as "reasonable police questioning").

To be sure, we have long sought "to inoculate trial proceedings against evidence of dubious scientific value" by disallowing evidence of polygraph results or examinations. *Rogers v. Commonwealth*, 86 S.W.3d 29, 39 (Ky. 2002) (citations omitted). At the same time, however, we have, in accord with *Wyrick*, rejected claims that polygraph exams, whether "real" or staged, invalidate the confessions they induce or render the confession evidence (cleansed of polygraph reference) inadmissible. *Rogers*, 86 S.W.3d at 37; *Wise v. Commonwealth*, 422 S.W.3d 262 (Ky. 2013); *Silverburg v. Commonwealth*, 587 S.W.2d 241 (Ky. 1979). In *Rogers*, however, this Court recognized an exception to the general rule against polygraph evidence for such evidence introduced by a defendant trying to show that his or her confession had been coerced. 86 S.W.3d at 40.

Undoubtedly, a defendant who confesses or who otherwise makes inculpating admissions during a post-polygraph interview faces a hard choice when it comes to deciding how best to confront that evidence, whether by revealing the polygraph, as he may under *Rogers*, or by some other means. But since, under *Wyrick*, there is nothing inherently improper about post-polygraph interrogations, and since the confessing defendant who proceeds under *Rogers* would likely be entitled to an admonition limiting how the polygraph evidence could be used, the confessing defendant's supposed "dilemma" strikes us as one of those tough but constitutionally permissible

53

choices acknowledged in *Jenkins v. Anderson,* rather than a constitutionally "intolerable" one such as confronted the suppression-seeking defendant in *Simmons.*

Our reasoning is as follows: Since the defendant is challenging a presumptively valid interrogation procedure, placing the burden of going forward on him is not unfair. Under *Rogers,* the defendant is free, if he wishes, to introduce polygraph evidence, so his right to present a defense is respected. And, although the point has not been raised and argued in this case in such a way as to allow a definitive statement, it would seem that a defendant mounting a *Rogers* defense would be entitled, upon request (KRE 105), to an admonition limiting the jury's use of the (otherwise inadmissible) polygraph evidence to the "coerced confession" issue, although the Commonwealth would be free to introduce other polygraph evidence subject to the same limitations, *i.e.,* the door would be opened to polygraph evidence on the issue of a "coerced confession." In that way the defendant's "right" not to be found guilty on the basis of unreliable evidence would likewise be preserved. To the extent, then, that Jenkins contends that *Simmons* precludes the Commonwealth's use at trial of all post-polygraph confessions, we disagree.

## B. The Limits the Trial Court Imposed on Jenkins's Use of Interview Evidence Did Not Violate the Rule of Completeness.

That is not quite the end of Jenkins's constitutional claim, but to understand that claim's final wrinkle it is necessary first to consider Jenkins's alternative reason for objecting to the Commonwealth's use of excerpts from his post-polygraph interview. The alternative, as noted above, is based on the so

54

called rule of completeness, a common-law rule now codified in KRE 106 ("Remainder of or related writings or recorded statements.").

That rule provides that when one party introduces "a writing or recorded statement or part thereof . . . an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." "KRE 106 is a rule of admission, not exclusion," *Soto v. Commonwealth*, 139 S.W.3d 827, 865 (Ky. 2004), and at first glance its general terms ("any other part," "any other writing or recorded statement") could suggest a broad rule. As Professor Lawson has noted, however, "Rule 106 does not open the door to a routine use of other parts of a writing or recording (or related writing or recording), only to parts (or related items) that should be produced "in fairness" to the opposing party." Lawson, § 1.20[2][b].

> Elaborating on this point, this Court has explained that
>
> [t]he completeness doctrine is based upon the notion of fairness—namely, whether the meaning of the included portion is altered by the excluded portion. The objective of that doctrine is to prevent a misleading impression as a result of an incomplete reproduction of a statement. *This does not mean that by introducing a portion of a defendant's confession in which the defendant admits the commission of the criminal offense, the Commonwealth opens the door for the defendant to use the remainder of that out-of-court statement for the purpose of asserting a defense without subjecting it to cross-examination.*

*Schrimsher v. Commonwealth*, 190 S.W.3d 318, 331 (Ky. 2006) (quoting (with added emphasis) *Gabow v. Commonwealth*, 34 S.W.3d 63, 69 (Ky. 2000)).

The United States Supreme Court has said much the same regarding the identical federal rule:

55

[W]hen one party has made use of a portion of a document, such that misunderstanding or distortion can be averted only through presentation of another portion, the material required for completeness is *ipso facto* relevant and therefore admissible under Rules 401 and 402.

*Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 172 (1988).

It is not "misleading" for the purposes of KRE 106, we have held numerous times, for the Commonwealth to introduce an incriminating portion of a defendant's statement shorn of the defendant's additional statements backtracking from, rationalizing, or otherwise attempting to explain or to lessen the effect of his admission. *See, e.g., Bond v. Commonwealth*, 453 S.W.3d 729, 736 (Ky. 2015) (holding that, while the excluded portions of the murder defendant's statement "may have given the jury a more complete description of [the defendant's] relationship to [the victim]," the exclusion did not "alter the meaning," for KRE 106 purposes, of the included confession); *Commonwealth v. Stone*, 291 S.W.3d 696, 702 (Ky. 2009) (rejecting assault defendant's claim that he should have been permitted to supplement the introduced portion of his statement, in which he admitted stabbing the victim in self-defense, with "his entire version of the events in its proper context").

In *Sykes v. Commonwealth*, 453 S.W.3d 722 (Ky. 2015), on the other hand, we held that the trial court abused its discretion under KRE 106 when it denied the defendant's request to correct a false impression that resulted from the manner in which the Commonwealth redacted the defendant's statement to investigators. The defendant had admitted that in the course of a restaurant

robbery he shot the restaurant's owner. At some point thereafter the detective continued the interview as follows:

> Detective: Well, the fortunate thing about this is that, as of now, the Chinese guy [the owner/shooting victim], he's still alive.
>
> Sykes: Yes sir. So I'm being charged with attempted murder.
>
> Detective: No. No, a shooting is a shooting. I don't think that it's an attempted murder. Were you trying to kill him?
>
> Sykes: No sir. I didn't even mean to shoot the guns. It was like my reaction, how he was coming.

Among other crimes, the defendant was charged with attempted murder, and at trial the Commonwealth presented to the jury, as evidence of Sykes's intent to kill, the detective's and Sykes's first statements just quoted. Sykes moved under Rule 106 to present the jury with the ensuing question and answer, but the trial court denied the motion. We held that by themselves, the first two statements distorted and gave a misleading impression of the exchange, such that the trial court's ruling amounted to an abuse of discretion. *See also, Beech Aircraft,* 488 U.S. at 153 (holding that the redacted version of a letter presented to the jury gave a false impression of the letter's true tenor so as to bring the pertinent federal rule (FRE 106) into play).

Jenkins contends that here, too, the Commonwealth's use of excerpts from his post-polygraph statement created a false impression and thereby implicated KRE 106. His contention is twofold. As previously noted, during the Commonwealth's direct examination of Sergeant Whittaker the prosecutor played for the jury two brief excerpts from Whittaker's post-polygraph interview of Jenkins. In the first excerpt Jenkins admits having had "fantasies"

57

regarding Jane during her September 2005 visit to Jenkins's home, and in the second he admits that under the influence of his medications he might unconsciously have acted on those fantasy impulses and engaged in sex with her.

As noted above, during his cross-examination of Sergeant Whittaker Jenkins sought to supplement the "it's possible" portion of his post-polygraph statement, as introduced by the Commonwealth, by having read to the jury the portions of the interview immediately preceding and immediately succeeding the already admitted portion.[23] The preceding portion, Jenkins argued, helped clarify the context of his statements by showing that the interview was then focused on the topic of medications, and the succeeding portion showed that while Jenkins admitted, hypothetically, that medications might lead a person to engage in sex unconsciously, he denied that that had happened to him. In particular, he insisted that his response when asked if he remembered anything, any part, of the alleged incident with Jane—"No. I don't remember me leaving the room."—made clear that his supposed admission was actually a denial.

The trial court granted Jenkins's request with respect to the lines preceding the Commonwealth's excerpt, and defense counsel read those lines to the jury. The trial court denied Jenkins's request with respect to the lines

---

[23] We note again that in the transcript of the interview reproduced above, the lines Jenkins moved to have introduced under KRE 106 have been underscored.

after the Commonwealth's excerpt, however, and that denial, Jenkins asserts, amounted to an abuse of the court's KRE 106 discretion. We disagree.

In our view, this is not a case, like *Sykes,* where the Commonwealth, by carefully choosing a defendant's isolated remark, created the impression of an admission when in context the remark gives a contrary, or at least a much different impression. Here, the excerpt the Commonwealth introduced accurately reflected Jenkins's limited admission that under the influence of medications, such as those he was taking at the time of the alleged incident, a person could possibly engage in sex without realizing it. The excerpt included Jenkins's denial of any memory suggesting that that had happened to him. The fact that Jenkins made other statements—such as his "I don't remember leaving the room" remark—that give his admission a somewhat stronger defense spin, does not render the Commonwealth's excerpt misleading or distorting, it only makes this case like *Bond* and *Stone.* Like the defendants in those cases, Jenkins "was free to testify at trial and fully present the facts as he understood them to be." *Stone,* 291 S.W.3d at 703. KRE 106 did not require more.

This brings us to the second part of Jenkins's KRE 106 argument, which is also the last twist to his "unconstitutional dilemma" claim. According to Jenkins, when he responded to Sergeant Whittaker's question about fantasies and medications by saying, "It's possible," what he meant was not that it was possible he had raped Jane under the influence of his medicines, but rather that it was possible his fantasies and medications somehow affected his

59

reaction to the polygraph exam such that certain true answers had seemed false to the machine. To clarify this meaning, Jenkins's argument runs, KRE 106 entitled him to reveal to the jury that the object of Sergeant Whittaker's questioning was to discover what "had screwed up the exam," but that remedy, the KRE 106 remedy, was inadequate. It was inadequate, Jenkins contends, because once again it placed him in the unconstitutional bind of either revealing the polygraph exam or allowing the Commonwealth to use a misleading excerpt from the post-exam interview. To spare him from that dilemma, Jenkins concludes, the trial court should have excluded (and should exclude in the event of a retrial) any and all evidence of the interview.

Although there may be legal merit to Jenkins's claim that the Commonwealth should not be permitted to use a misleading excerpt from a writing or recording to pressure a defendant to reveal a polygraph exam, we need not assess that merit here because the factual premise is missing. The interview excerpts quoted above show, we believe, that while Sergeant Whittaker did indeed confront Jenkins several times with the need to account for the polygraph results and with the suggestion that subconscious deceit may have been a factor, he never suggested that medication, in and of itself, could compromise a polygraph. Jenkins, moreover, when asked if it was "possible," clearly understood that he was being asked, not whether his medication might somehow trigger a polygraph machine, but whether someone under the influence of certain medications might act on sexual impulses without being conscious of it, the unconscious awareness of the act then causing the

60

polygraph failure. If that were not Jenkins's understanding, he would not have added that he had no recollection of acting that way.

Because it is clear that the "it's possible" interview excerpt introduced by the Commonwealth did not misrepresent Jenkins's answer in the way he contends, it is also clear that the admission of that excerpt did not confront him with the untenable dilemma he claims. The trial court did not, in sum, abuse its discretion by allowing the Commonwealth to introduce the excerpts from Jenkins's statement.

## CONCLUSION

In sum, we affirm the part of the trial court's Judgment convicting Jenkins of rape in the first degree and sentencing him to twenty years' imprisonment. There was sufficient evidence that Jenkins forcibly compelled his step-granddaughter to engage in sexual intercourse to support the jury's guilty verdict, and neither the trial court's refusal to instruct the jury on the offense of sexual misconduct; the court's admission of very limited testimony by the victim that Jenkins had sexually abused her in the past; nor the court's admission of some portions of Jenkins's post-polygraph interview, but exclusion of other portions constituted an error or an abuse of the court's discretion. Although the evidence that Jenkins forcibly subjected his step-granddaughter to oral/genital sodomy was also sufficient, we reverse the conviction for that offense and its corresponding twenty-year sentence because the pertinent jury instruction was "duplicitous," as recent cases have explained that term, in violation of the Kentucky Constitution's unanimous verdict

61

requirement. We hereby remand the matter, accordingly, to the Ohio Circuit Court for entry of an amended Judgment, and for additional proceedings consistent with this Opinion.

All sitting. Minton, C.J.; Keller, Noble, and Wright, JJ., concur. Cunningham, J., dissents by separate opinion in which Venters, J., joins. Venters, J., dissents by separate opinion in which Cunningham, J., joins.

CUNNINGHAM, J., DISSENTING: A woman should be able to say no to any sexual advance without resisting physically. That is the current law. *Gibbs v. Commonwealth*, 208 S.W.3d 848 (Ky. 2006). A woman should be able to resist a sexual advance by simply saying no and the violator still be accountable, even if force or threat of force is not used. According to the majority, that is not the current law. Our holding today disputes that right because of a case decided almost forty years ago.

Therefore, I respectfully dissent. I also join Justice Venters' dissent. One of the proudest boasts I have of my brothers and sisters on this Court is that we have maintained a steady respect for state decisions without being shackled to past folly. Yet, today we perpetuate an aberration by once again following the *Cooper* case. By doing so we hold that it is not a crime to have sex against another's will, unless physical force or the threat of physical force is used.

The evidence of physical force in this case was very weak. We have a seventeen year old woman. She was in her room admitting she was sending a "perverted" message to her boyfriend. She said she thought nothing was wrong

with her step-grandfather massaging her shoulders. Nor, did she see anything wrong with him wanting to take her picture. She was knowledgeable for the slang for oral sex. She testified that she was not threatened. She testified that the Appellant never kept her from getting up and leaving the room. She testified that he did not make her do it. She admitted that her grandmother was in the next room where any protest could have easily been heard.

The majority relies upon her testimony that the Appellant "forcibly rolled her over, removed her pajama pants, and then physically pushed aside her several attempts to block him from sodomizing her." The jury is at liberty to believe or disbelieve any or all of the complaining witness' testimony. It could have easily not believed this aspect of her testimony, but also be fully convinced that it was against her will.

The jury would have had good reason to believe that she did not consent, but did not physically resist. The jury could have easily concluded that he did not use force or the threat of force.

*"I didn't want to, and I didn't feel comfortable to. It was just kind of . . . it was always what happened. It was just something that I guess I was used to, 'cause that's always what happened.'"*

It was "always what happened." We can only interpret that as there was no need for either him to use force, or for her to resist. But, it was still against her will. The jury could have reasonably found that it was without both force and her consent. But they could not find him guilty of a lessor included crime because the lessor included instruction was not given.

In KRS 510.140, the crime of sexual misconduct reads:

(1) A person is guilty of sexual misconduct when he engages in sexual intercourse or deviate sexual intercourse with another person without the latter's consent.

(2) Sexual misconduct is a Class A misdemeanor.

The statute is simple, clear, and unequivocal. There is nothing in the body of this statute which restricts it to juvenile participants. Our interpretation of it, beginning with the *Cooper* case, relies on the Commentary and ignores the glaring fallacy of that interpretation.

Like Justice Venters in his aptly written dissent, I take serious issue with the interpretation that both the *Cooper* Court and the present majority give to the Commentary to KRS 510.140.

First of all, it implicitly acknowledges this crime being a lesser offense to more serious sexual crimes when it states as follows. "It provides a useful plea-bargaining tool for the prosecutor in certain cases even though some degree of forcible compulsion or incapacity to consent may be present." KRS 510.140.

Secondly, it states that the statute is "designed *primarily* to prohibit nonconsensual sexual intercourse of deviate sexual intercourse" when the participants are under certain ages. KRS 510.140 (emphasis added). This "primary" purpose is not mutually exclusive of it being a lesser included of rape in the first degree in all cases. Otherwise, the language of the plea-bargaining utilization makes no sense.

64

It is clear in reading the Commentary closely that the *Cooper* decision is a misconstruction of what the Commentary actually says.

As noted by the majority, there have been some subsequent cases following *Cooper*. However, as this Court has wisely concluded in the past, "the doctrine of stare decisis does not commit us to the sanctification of ancient fallacy." *Hilen v. Hays*, 673 S.W.2d 713, 717 (Ky. 1984).

If that had been the intent of the legislature, it would have restricted it to only application in cases where both parties involved are under age. Why should it be a crime to commit a sexual act against a person under sixteen and not with a thirty year old victim?

The majority also complains that to read KRS 510.140 as I read it "would allow rape and sodomy to be treated as either a felony or misdemeanor at the prosecutor's or the jury's discretion without legislative guidance as to the distinction." The distinction is clear on its face. Sexual intercourse by forcible compulsion is rape in the first degree; sexual intercourse without forcible compulsion but against the will of the victim is sexual misconduct. I fail to see the need for "legislative guidance." It's not unlike our assault statutes. A person is guilty of a serious felony (5 to 10 years) if that person intentionally causes serious physical injury to another person. KRS 508.020. But the same person is guilty only of a misdemeanor if the jury determines that he or she intentionally inflicted only physical injury upon a person. KRS 508.030. Prosecutor and jury discretion permeates our entire justice system.

65

In recent years we have changed our criminal law to provide the right to a wife to say no to a husband's sexual advancement and mean it. We have seen the alarming escalation of sexual assaults upon children and grand-children which carry on even after the victims have reached sixteen years of age. After the nightmarish repetition of such vile acts, the victims become physically compliant, although not consensual, creating continual opportunities for the offender to commit the acts without force or the threat of force.

It's impossible to anticipate all the other diabolical designs where non-consensual sex may invade the integrity of the victim's body without physical force or threat of force.

These incredibly mean acts should be recognized as criminal under the plain reading of KRS 510.140.

I've searched in vain to find any other state which gives such a clearly stated statute such an off the page interpretation as we continue to do with this opinion. All that I've found with similar, if not identical, sexual proscription do not limit the crime to juveniles. *See Johnson v. State of Delaware*, 929 A.2d 784 (De. 2007); *Burton v. State of Delaware*, 2000 WL 703810 (De. April 19, 2000).

Mark Twain reportedly said, "if the world ever comes to an end, I want to be in Kentucky. Everything there happens 20 years after it does anywhere else." It's an unfair and inaccurate slam at our beloved Commonwealth. But here, it just seems to fit.

Venters, J., joins.

VENTERS, J., DISSENTING: I join Justice Cunningham's dissent, and to his voice, I add my concern about the majority's distortion of a statute that is crystal clear in its meaning and effect. Few if any statutes are as concise and unambiguous as KRS 510.140, both as it stands alone and when read in context with the whole of KRS Chapter 510. It makes perfect sense as written and requires none of the excess verbiage grafted onto it by the majority opinion. "When the statute is plain and unambiguous, the language of the statute is to be given full effect as written .... This Court should not resort to the task of deciphering legislative intent in order to interpret the language of a statute which is abundantly clear." *Mohammad v. Commonwealth*, 202 S.W.3d 589, 590 (Ky. 2006) (citations omitted). The LRC Commentary is to be used "as an aid in construing provisions" of the penal code, KRS 500.100, but the majority arrogates the commentary to the dignity of the statute itself. Moreover, it does so in derogation of the plain language of the statute, apparently because it disagrees with the obvious meaning of the plain language. Worse yet, the majority's interpretation of the commentary is just plain wrong.

KRS Chapter 510 set forth a judiciously crafted schedule of graduated offenses designed to punish a wide range of unacceptable acts of sexual aggression. It comprehensively matches the severity of punishment for the offender with the egregiousness of his conduct, scaling the offenses based upon specific factors: the degree of force used by the perpetrator; the degree to which

67

the victim suffered physical injury; the unique vulnerability of the specific classes of victims (for example, children and physically helpless or mentally incapacitated adults); the age of the perpetrator in relation to the victim; and the perpetrator's abuse of a position of authority or special trust relating to the victim.

Within this cohesive and interlocking structure, the offenses of unlawful sexual intercourse range from Rape in the First Degree for the perpetrator who uses *forcible compulsion* to overpower the victim and causes the victim to suffer serious physical injury (or whose victim is physically helpless or less than 12 years of age) under KRS 510.040, through Rape in the Second Degree under KRS 510.050 and Rape in the Third Degree under KRS 510.060, to Sexual Misconduct under KRS 510.140 for the perpetrator who, without forcible compulsion, engages another person in an act of sexual intercourse or sodomy without that person's consent. Each descending step from first degree rape to sexual misconduct involves a progressively lesser sentence reflecting the General Assembly's judgment of progressively less injurious or less egregious conduct. Given the meticulous specificity employed by the legislature to delineate each of the crimes established in Chapter 510, it is inconceivable that such a critical limitation as the one that the majority reads into KRS 510.140 was simply left unstated, to be deciphered like a secret code hidden, not in the language of the statue, but in commentary.

The plain language of KRS 510.140 as it is plainly written dovetails precisely into the legislative scheme. It makes perfect sense within the

spectrum of crimes laid out by the legislature. It criminalizes the offensive act of having sexual intercourse with one who had not consented even when the perpetrator did not resort to forcible compulsion or physical injury, but has instead simply acted without the victim's permission. The language of the statute alone is plain and complete, enabling any reasonable person to discern its meaning. Nevertheless, the majority strips the law of its simplicity and shrouds it under a complex construction based upon a faulty interpretation of the legislative commentary.

The commentary explains that the statute was "designed primarily" for nonconsensual intercourse in the two specific situations identified by the majority. However, *"primarily"* does not mean *exclusively*; the use of the word "primarily" expressly signifies the existence of other, albeit secondary, applications. One such application is identified in the very first paragraph of the commentary relied upon by the majority: "[KRS 510.140] provides a useful plea-bargaining tool . . . in certain cases even though some degree of forcible compulsion or incapacity to consent may be present."

Those "certain cases" would be situations like the instant case where fitting the perpetrator's conduct into the statutorily definition of "forcible compulsion" is a close call at best, and one which the jury may not readily accept. The majority's strained and complex construction restricts the application of KRS 510.140 to situations involving minors and others incapable of consent, thereby eliminating the offense of sexual misconduct for other classes of victims in cases where a finding of "forcible compulsion" is far from

certain, but a lack of consent is clear. As Justice Cunningham explains in his dissenting opinion, without the option provided by KRS 510.140, jurors (and sometimes prosecutors and judges) in such cases who cannot conscientiously regard the perpetrator's conduct as "forcible compulsion" will feel bound to acquit, leaving the victim of unwelcome sexual aggression without justice.

Sexual misconduct is a crime created by the General Assembly as a lesser-included crime within the spectrum of rape offenses applicable when the victim did not consent to intercourse (or sodomy) and the proof of forcible compulsion is less than compelling. KRS 510.140 expresses the General Assembly's intent to criminalizing the conduct of those who, while not resorting to "forcible compulsion," nonetheless act reprehensibly to deprive a victim of her right to say "no" and the sexual dignity that goes with that right.

Despite the plain delineation of the legislature to the contrary, the majority seems to believe that every act of nonconsensual sexual intercourse is inherently an act of "forcible compulsion," thus eliminating the crime of sexual misconduct in all but the few applications involving juvenile victims and youthful perpetrators. By writing its belief into the law the majority casts itself into the role of the legislature, putting words into the statute in derogation of the legislature's preference and diminishing the prospects for justice for both the perpetrator and the victim in close cases like this one. For these reasons, I respectfully dissent and join the dissent of Justice Cunningham.

Cunningham, J., joins.

70

COUNSEL FOR APPELLANT:

Susan Jackson Balliet
Assistant Public Advocate
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Andy Beshear, Attorney General of Kentucky

Perry Thomas Ryan
Assistant Attorney General